**Miguel Mayet PALMA, Appellee,**

v.

**R. J. VERDEYEN, William French Smith, Appellants.**

**No. 81–7013.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 2, 1982.

Decided April 7, 1982.

---

Before BUTZNER, HALL, and SPROUSE, Circuit Judges.

BUTZNER, Circuit Judge:

The United States appeals a district court's grant of a writ of habeas corpus to Miguel Mayet Palma, an alien, presently detained in the Petersburg Federal Correctional Institute. The district court recognized that Mayet Palma could be detained pending administrative exclusion proceedings and for a reasonable time thereafter while the government attempted to return him to Cuba. But relying primarily on *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir. 1981), it held that neither the Immigration and Nationality Act nor the Constitution empowered the government to detain him indefinitely after attempts to return him proved futile. We reverse.

I

In 1980, some 125,000 Cuban aliens arrived without visas in Florida aboard a flotilla of small boats. Cuban authorities had taken advantage of this exodus to give criminals the option to remain in prison or to leave for the United States. Immigration officers found that about 25,000 of the arriving aliens admitted some criminal history, but only about 2,000 were deemed to have backgrounds serious enough to warrant continued detention. Most of the other aliens were promptly paroled under provisions of the Immigration and Nationality Act, 8 U.S.C. § 1182(d)(5), after sponsors were found.[1]

Exclusion proceedings were begun against the 2,000 aliens who were not suitable for immediate parole. In the meantime, they were held at various federal institutions, including the federal penitentiary in Atlanta. Mayet Palma was transferred from Atlanta to Petersburg for his own safety after he witnessed a prison murder.

Lauri Steven Filppu, Gen. Lit. and Legal Advice Sec., Crim. Div., U. S. Dept. of Justice, Washington, D. C. (Elsie L. Munsell, U. S. Atty., Alexandria, Va., G. Wingate Grant, Asst. U. S. Atty., Richmond, Va., Lawrence Lippe, Chief, Gen. Lit. and Legal Advice Sec., Crim. Div., U. S. Dept. of Justice, Washington, D. C., on brief), for appellants.

Stephen K. Glenn, Richmond, Va. (Layne, Hayes & Smith, Christopher Holdridge, Richmond, Va., on brief), for appellee.

1. As of the summer of 1981, 122,000 of the Cuban aliens had been paroled. Of the 2,000 detained for their serious criminal backgrounds, over 800 had been approved for parole by December. Five hundred of this latter group had actually been released by December, with the remaining 300 awaiting suitable sponsorship.

In the summer of 1981, the Attorney General announced that the government intended to return to Cuba all excludable aliens still in detention. Cuba refused, however, to take them back. For the purpose of this case, we must assume on the basis of the record that the United States is not presently negotiating with Cuba for the return of any aliens and that Cuba will not soon change its policy.

The Attorney General also refined the procedures for review of each detainee's case. The current plan, adopted in July 1981 and twice modified, calls first for a review of the detainee's file. If parole cannot be recommended on that basis, a panel composed of Immigration and Department of Justice officials personally interviews the detainee. The panel must determine if the detainee should be recommended for parole, considering such factors as his past criminal history, his record of disciplinary infractions while in custody, and his cooperativeness in institutional work and vocational programs. Release cannot be recommended unless the panel members agree that (1) the detainee is presently a nonviolent person, (2) he is likely to remain nonviolent, and (3) he is unlikely to commit any criminal offense following his release. Panel recommendations are not conclusive but must be approved by the Commissioner of the Immigration and Naturalization Service. The plan requires subsequent review of a detainee within one year after a decision denying him parole, and it allows earlier review on the recommendation of the staff of the institution where the alien is detained. The plan states that after all detainees have received subsequent reviews, the procedures will be reevaluated for the purpose of determining future review of the remaining detainees.

II

Mayet Palma arrived in the United States on June 3, 1980, as part of the Cuban flotilla. He lacked a visa or other entry papers and later gave a sworn statement that before he left, he had been in prison for a second theft offense. United States authorities were unable to make an independent verification of Mayet Palma's criminal record and have accepted at face value his assertion that he received five and ten year sentences for stealing a violin and a radio.

By August, immigration officials had notified Mayet Palma that he appeared to be an excludable alien as defined by 8 U.S.C. § 1182(a)(9) (aliens who have been convicted of crimes of moral turpitude) and 8 U.S.C. § 1182(a)(20) (aliens lacking a visa, passport, or similar document). In April, 1981, an immigration judge conducted an exclusion hearing pursuant to 8 U.S.C. § 1226(a) and held Mayet Palma excludable under the two cited provisions. The judge also held that Mayet Palma was not a refugee entitled to asylum under the 1967 Protocol and Convention Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. 6577, or the Refugee Act of 1980, Pub.L.96–212, 94 Stat. 102 [8 U.S.C. §§ 1101(a)(42) and 1253(h)]. His appeal, authorized by § 1226(b), to the Board of Immigration Appeals, where he was assisted by counsel, was considered and dismissed on the merits. *In re Mayet Palma*, A23 220 135 (B.I.A. Jan. 13, 1982) (unreported decision). Accordingly, Mayet Palma is now subject to a final order of exclusion.

In the meantime, a review panel had examined Mayet Palma's file and decided not to recommend his parole. Following the Attorney General's procedures, it scheduled an interview with him in December, 1981, at which he was represented by counsel. Two of the three members of the interviewing panel recommended parole, but the Commissioner declined to follow this recommendation. The Commissioner based his decision on the uncontested disciplinary record compiled by Mayet Palma during his detention: since his arrival in the United States, he had set ten fires at the prison, assaulted the staff, and fought with other detainees.[2]

---

2. We note that the record of the habeas corpus hearing also shows that Mayet Palma has on occasion thrown fecal matter at prison officials, turned a water hose on a member of the

Mayet Palma filed a petition for habeas corpus, a third avenue to release. On December 29, 1981, the district judge granted the writ and ordered Mayet Palma to be released the following day to an uncle in New York.[3] We stayed this judgment pending an expedited appeal. On appeal Mayet Palma does not claim to be a refugee within the meaning of the Protocol and Convention Relating to the Status of Refugees or the Refugee Act of 1980. He does not rely on international law but bases his claim on the Constitution and the Immigration and Nationality Act. Specifically, he contends that the Attorney General deprived him of his liberty without due process of law in violation of the fifth amendment. He also asserts that even if the law authorized his detention, the Attorney General abused his discretion in denying him parole.

### III

Congress has virtually plenary authority over the admission of aliens. *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977). It may exclude aliens for reasons that it deems to be in the public interest. The *Chinese Exclusion Case*, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). Although it may detain an alien pending exclusion, it may not supplement the order of exclusion by inflicting summary punishment at hard labor. *Wong Wing v. United States*, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896). Nevertheless, indefinite detention of a permanently excluded alien deemed to be a security risk, who is refused entry to other countries, is not unlawful. *Shaughnessy v. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Although the statutes applicable to these cases differed, all of the Court's opinions

rested on the following principles. A sovereign state has an inherent right to exclude aliens. In the United States the Constitution commits enforcement of this right to the Congress, which in turn may authorize officers of the executive branch to exercise it. *See Nishimura Ekiu v. United States*, 142 U.S. 651, 659–60, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892). This congressional power over the exclusion of aliens has a corollary: "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Knauff v. Shaughnessy*, 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950). Of course, in an appropriate case, to ascertain what Congress has authorized, one must consider the treaties, agreements, and customary international law to which the United States subscribes, as well as to domestic law. In this appeal, however, the parties have addressed the issues in terms of domestic law.

Section 1225(b) of 8 U.S.C. provides that an arriving alien may be detained for inquiry. Section 1227(a) directs the immediate return of the excluded alien "unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper." Subject to an exception not applicable to this case, § 1182(d)(5) authorizes the Attorney General in his discretion to parole temporarily an alien who seeks admission, if parole is justified for emergent reasons or is deemed to be in the public interest. When the purpose of the parole has been served, the Attorney General is empowered to return the alien to custody. In addition to these specific grants of authority, Congress in § 1103 conferred broad general powers on the Attorney General for the enforcement and administration of the Immigration Act.

---

correctional staff, thrown kitchen glasses at another inmate and a food tray at a staff member, threatened staff members with a razor blade, stolen clothes from other inmates, and received a generally unfavorable psychiatric evaluation.

**3.** After the entry of the district court's judgment, an official of the Office of Refugee Resettlement interviewed this relative. He turned

out to be Mayet Palma's cousin, not his uncle. The cousin had agreed to put Mayet Palma up in a hotel for a few weeks and to help him find a job. He declined to let Mayet Palma stay in his house or to provide financial or other assistance for more than a few weeks, asserting that he and his wife were too old to get involved with any difficulties Mayet Palma might experience in adjusting to American society.

■ It is apparent, as the district judge emphasized, that none of these statutes expressly authorizes the Attorney General to detain an alien indefinitely after an unsuccessful attempt to return him. Nevertheless, we conclude that Congress implicitly authorized the Attorney General to order such detention. In reaching this conclusion, we believe that the fifth and sixth amendments do not require a restrictive interpretation of the Immigration Act that would either circumscribe the right of the United States to deny admission to aliens or limit the congressional power granted in Article I § 8 "to regulate Commerce with foreign Nations . . . ." Moreover, we must recognize that the scope of judicial review of the Attorney General's decisions is narrow. Restrictions on judicial intervention in matters of immigration are authoritatively documented. In *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the Court considered the constitutionality of a statute denying medicare benefits to certain aliens. Rejecting the claim of Cuban refugees that the statute was unconstitutional, the Court said, 426 U.S. at 81–82, 96 S.Ct. at 1892:

> Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution. The reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

Although Congress has not expressly granted the Attorney General authority to detain an excluded alien indefinitely, it has not expressly denied this authority when the alien cannot be returned and the Attorney General finds him unsuitable for parole. Significantly, however, under other circumstances, Congress has restricted the Attorney General's discretion. Thus, if an alien is subject to deportation, as distinguished from exclusion, § 1252(c) directs the Attorney General to deport him within six months.[4] During the six month period, the Attorney General may detain the resident alien or release him on bond or on other conditions. Judicial review of the Attorney General's decision is expressly authorized. 8 U.S.C. § 1252(c).

The absence of a six month restriction on detention and of judicial review in the exclusion provision of § 1227(a) is indicative of congressional intent to authorize restrictions on the freedom of excluded aliens greater than those imposed on resident aliens. Furthermore, the obverse of the grant of discretionary authority in § 1182(d)(5) to parole an excluded alien is a grant of authority to deny parole. Therefore, we conclude from analysis of these sections of the Act that the Attorney General has implicit authority to detain rather than parole an excluded alien who cannot be returned to his own country.

Congress has not, however, granted the Attorney General unfettered power to detain an excluded alien arbitrarily. As we have mentioned, § 1227(a) requires the immediate return of such an alien "unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper." The Attorney General has complied with this proviso by instituting procedures, which we described in Part I of this opinion, for review of each Cuban detainee.

The Attorney General's current procedures for review distinguish this case from *Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir. 1981), which the district court followed and on which Mayet Palma now relies. There the court affirmed with modification the grant of a writ of habeas corpus to a detainee, who, like Mayet Palma, had been imprisoned in Cuba for theft

---

**4.** The deportation of resident aliens requires procedures quite distinct from those invoked for the exclusion of arriving aliens. Congress provided for each procedure in separate sections of the Immigration Act. Although Congress has at times used "deportation" to indicate the return of excluded aliens, the use of the word in the exclusion sections "reflects none of the technical gloss accompanying its use as a word of art" in the deportation sections. *Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958).

when he was allowed to join the flotilla to the United States. The Attorney General had found Rodriguez-Fernandez suitable for parole pursuant to § 1182(d)(5), but his release on parole was suspended pending review of the government's policies. His petition for habeas corpus sought release during this period of suspension.

The government asserts that *Rodriguez-Fernandez* was incorrectly decided, but we believe it is unnecessary to address this argument. It is sufficient for us to note that the Attorney General is now complying with the proviso of § 1227(a). He is now considering for each detainee individually whether immediate deportation is practicable or proper. Obviously immediate deportation of the Cuban aliens is not practicable. In *Rodriguez-Fernandez*, however, the decision had been made that immediate deportation was not proper and that, like thousands of other Cubans, Rodriguez-Fernandez was suitable for parole. Here, in contrast, the Attorney General has determined that Mayet Palma's immediate deportation is proper, though impracticable, and that he is not suitable for parole.

Finally, we address Mayet Palma's contention that even if the Attorney General has authority to detain him, he is entitled to parole. He therefore claims that the Attorney General's denial of parole was an abuse of discretion. The government acknowledges that a district court has jurisdiction to review the legality of an alien's detention in a habeas corpus proceeding. It insists, however, that judicial review is confined to ascertaining whether the detainee is a citizen or an alien and whether the Attorney General has followed statutory procedures in determining whether the alien is excludable. Alternatively, the government argues that even if judicial review encompasses the merits of the Attorney General's decision to deny Mayet Palma parole, the court's function is limited to the narrow review accorded other forms of prosecutorial discretion.

This case presents no occasion for precisely defining the scope of judicial review of the Attorney General's decision other than to recognize that it is narrow. *See Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). Accepting, without deciding, the propriety of the scope of review Mayet Palma urges, we conclude that the Attorney General did not abuse his discretion. The Attorney General complied with statutory requirements in determining that Mayet Palma was an excluded alien. He also complied with § 1182(d)(5) and his own plan for determining whether Mayet Palma was suitable for parole.

The Commissioner, acting as the Attorney General's delegate, was required by the terms of § 1182(d)(5) to determine whether Mayet Palma's parole was in the public interest. For the following reasons he decided that parole for Mayet Palma was not in the public interest:

> You have been convicted for theft twice. While in detention you have set 10 fires, assaulted the staff, and fought with other detainees. It appears that when you are frustrated, you react by committing dangerous or violent acts. You must control these impulses and have a substantial period of clear conduct before release can be authorized.

Mayet Palma does not dispute the Commissioner's findings of fact concerning his breaches of discipline while in custody.

■ We conclude that Mayet Palma's disciplinary infractions, together with his convictions for crimes of moral turpitude in Cuba, warrant the Attorney General's denial of parole. The Attorney General therefore has not acted arbitrarily nor has he abused his discretion by detaining Mayet

Palma pending further review of his suitability for parole in accordance with the Justice Department's plan.[5]

The judgment of the district court is reversed.

---

5. We note that our opinion comports with a recent exposition of customary international law. "A state violates [customary] international law if, as a matter of state policy, it practices, encourages or condones ... prolonged arbitrary detention ...." *Restatement of the* *Foreign Relations Law of the United States* § 702 (Tent. Draft No. 3, 1982). As we have demonstrated, the Attorney General's withholding of parole from Mayet Palma is not arbitrary.