Luis **ALVAREZ–MENDEZ,** Petitioner,

v.

Fred **STOCK,** Warden, Respondent.

No. CV 89–4627–IH(T).

United States District Court,
C.D. California.

Aug. 15, 1990.

---

Luis Alvarez Mendez, in pro. per.

Robert L. Brosio, U.S. Atty., Frederick M. Brosio, Jr., Asst. U.S. Atty., Chief, Civ. Div., Michael C. Johnson, Asst. U.S. Atty., Los Angeles, Cal., for defendant Fred Stock, Warden, et al.

## REVISED ORDER ADOPTING REVISED REPORT AND RECOMMENDATION OF MAGISTRATE

IRVING HILL, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has reviewed the petition, all of the records and files herein, and the attached Revised Report and Recommendation of Magistrate dated March 19, 1990 and the Objections to the Report and Recommendation filed on December 6, 1989. The Honorable Irving Hill, United States District Court Judge, concurs with and adopts the findings and conclusions of the Magistrate after having made a *de novo* determination of the portions to which objections were directed and adopts the Revised Report and Recommendation of the Magistrate in its entirety as his own opinion in the case.

IT IS ORDERED that the Petition for Writ of Habeas Corpus filed herein is denied.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order and Judgment by United States mail on the petitioner, and the United States Attorney for the Central District of California.

## REPORT AND RECOMMENDATION OF MAGISTRATE (REVISED)

VENETTA S. TASSOPULOS, United States Magistrate.

This Report and Recommendation is submitted pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and General Order No. 194 of the United States District Court for the Central District of California.

The Magistrate's initial Report and Recommendation was filed on December 6, 1989. On January 5, 1990, the District Court issued an Order stating its intention to adopt the Magistrate's Report and Recommendation. However, the Court noted the omission of certain information, and in the interest of completeness, requested that a revised Report and Recommendation be filed and served on the parties. The District Court listed several factual areas that should be addressed in the revised Report and Recommendation.[1]

## INTRODUCTION

Petitioner is in the custody of the Immigration and Naturalization Service (hereinafter "INS"), and is being detained at the federal correctional facility at Terminal Island in San Pedro, California. Petitioner has filed a petition for a writ of habeas corpus seeking release from federal custody based on his allegations that he is being indefinitely detained in a federal prison without having committed a crime in violation of his rights under the Constitution of the United States.

## FACTUAL BACKGROUND

Petitioner, a Cuban citizen, arrived in the United States by boat from Mariel, Cuba at Key West, Florida on May 20, 1980.[2] He was paroled into the United States on September 24, 1980, pursuant to Section 212(d)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1182(d)(5).[3] (Return, Exhibits "A" and "B").

Petitioner remained at liberty until he was indicted on charges of first degree murder, armed burglary with an assault, armed robbery and armed kidnapping. (Supplement to Respondent's Return, Exhibit "A"). Petitioner and a codefendant apparently went to the victim's apartment, struck the victim on the head and bound and gagged him, causing his death. Petitioner and his codefendant then removed a television and/or stereo from the apartment. (*Id.*) Pursuant to a negotiated plea of guilty, petitioner was convicted in the Circuit Court of Dade County, Florida on January 23, 1985 of second degree murder, as reduced; armed burglary with an assault with a dangerous weapon (to wit, a rock); and, armed robbery with a deadly weapon (to wit, a rock). (*Id., see also* Return, Exhibit "C"). On March 14, 1985,

---

1. Pursuant to the Court's Order for a revised Report and Recommendation, the Magistrate filed an Order Re Further Proceedings on January 9, 1990 ordering the Respondent to file a statement setting forth facts, discussion, pertinent legal argument, and evidence addressing both the District Court's and the Magistrate's additional areas of inquiry. After receiving an extension of time in which to file its response, the Respondent filed the required Statement on February 14, 1990. Petitioner was afforded the opportunity to respond to any facts, evidence, or argument presented by the Respondent. Petitioner filed his Statement on February 20, 1990.

2. "In early April 1980, some 10,800 Cuban citizens claiming status as political refugees sought sanctuary in the Peruvian Embassy in Havana. On April 14, 1980, President Carter declared that, pursuant to the Refugee Act of 1980, up to 3,500 of these refugees would be admitted into the United States. He allocated up to $4.25 million for their resettlement. 45 Fed.Reg. 28079 (April 28, 1980). An airlift was started but within three days Castro stopped the flights, announcing that anyone who wanted to leave could do so through the harbor at Mariel. Almost immediately, small boats, funded by members of the Cuban–American community, began leaving Key West." *United States v. Frade,* 709 F.2d 1387, 139 (11th Cir.1983).

Petitioner was part of the Mariel Boatlift, or "Freedom Flotilla", by which some 114,000 Cuban refugees, in nearly 1,800 boats, crossed the ninety miles of ocean between Cuba and the United States. "Over 23,100 of the arrivals admitted prior criminal convictions." *Alonso–Martinez v. Meissner,* 697 F.2d 1160, 1161 n. 4 (D.C.Cir.1983).

3. The statute provides that the Attorney General may in his discretion temporarily parole an alien applying for admission to the United States.

petitioner was sentenced to twelve years imprisonment on each count to run concurrently. (Return, Exhibit "C").

Petitioner was received into INS custody on August 10, 1988 and remains in INS custody at the Federal Correctional Institution at Terminal Island, California. He has completed serving the period of incarceration imposed by his state sentence. He is not on parole from his state sentence. (Respondent's Statement, page 2); *see also* Petitioner's Statement, Attachment (State of Florida Department of Corrections Record of Inmate Discharge).[4]

Based on this conviction, the INS revoked petitioner's parole status on August 10, 1988, and he was returned to INS custody for exclusion and deportation proceedings. (Supplement, Exhibit "A"; Return, Exhibit "B"). After a hearing before an immigration judge, petitioner was found excludable and deportable from the United States by order dated October 6, 1988. (Return, Exhibit "D"). Petitioner's appeal to the Board of Immigration Appeals was summarily dismissed by an opinion dated February 23, 1989. (Return, Exhibit "E").

Petitioner's case was reviewed by a review panel pursuant to the Cuban Review Plan.[5] In addition to the above mentioned conviction, the Panel found that:

(1) petitioner had been arrested in Miami, Florida on March 13, 1984 and charged with forgery, grand theft, and uttering a forged instrument;

(2) on December 23, 1982, petitioner was arrested, in Miami, Florida, and charged with grand theft;

(3) in Minneola, New York on September 7, 1981, petitioner was arrested and charged with petit larceny;

(4) a bench warrant was issued for petitioner's arrest on September 22, 1982 in the District Court of Nassau County, New York;

(5) while in the custody of the Florida Department of Corrections, petitioner

was reported to be fighting on November 5, 1985; and,

(6) on his INS Form I–589 (Request for Asylum), dated June 6, 1980, petitioner admitted being arrested "six or seven times" in Cuba for disrespect to police and was incarcerated for one year. The Panel also found that petitioner subsequently filed another I–589 dated September 7, 1988 in which he claimed to have received a ten year prison term for political crimes and robbery. Petitioner arrived in the United States directly from prison.

(Supplement to Return, Exhibit "A", pages 2–3).

In addition to the facts of petitioner's arrests and convictions, the Panel also noted that petitioner was not credible on key issues because he would not accept responsibility for his criminal acts. Petitioner maintained his innocence on the murder charge despite his confession to the police and his plea of guilty to the charges. (*Id.*, at page 3). The Review Panel recommended that INS continue to detain the petitioner because they were "unable to conclude that he was presently a nonviolent person or likely to remain nonviolent or not likely to commit further crimes if released." (*Id.*; *see also* 8 C.F.R. § 212.12(d)(2)–(3) (areas for consideration by the Review Panel)).

Petitioner had appeared for his panel interview at Avoyelles Parish Jail, Marksville, Louisiana on November 1, 1988. On December 13, 1988, the Associate Commissioner for Enforcement mandated that petitioner was ineligible for release on parole. (Return, Exhibit "G"). Petitioner has received a copy of the Panel's findings and justification supporting its decision recommending against parole. (Supplement to Return, Exhibit "A").

In response to correspondence from the petitioner, INS informed petitioner in a let-

---

**4.** Theoretically, if petitioner's writ of habeas corpus were granted by the Court, petitioner would be released from INS custody since there are no outstanding detainers on petitioner's status and he would be freed.

**5.** The Cuban Review Plan provides for annual review of Mariel Cubans to determine eligibility for parole. The INS regulations governing the Review Plan are set forth at 8 C.F.R. §§ 212.12 through 212.13 (1989).

ter dated February 13, 1989, that his case was tentatively scheduled for another review within one year of the previous denial of approval for release on parole. (Return, Exhibit "G"). Petitioner was again interviewed by an INS parole panel on January 3, 1990 and a final decision by the Associate Commissioner for Enforcement is pending. (Respondent's Statement, page 6).

### EFFORTS TO REPATRIATE PETITIONER

The government of Cuba has not refused to accept the Mariel excludables as a group. However, the government of Cuba is currently accepting for repatriation only those Mariel excludables who appear on a list of 2,746 named individuals which INS identified in December of 1984 as warranting efforts to enforce their departure from the United States because of their serious criminal activities or serious mental infirmities. Respondent contends that the United States has consistently taken the position that the Cuban government will be expected to accept the return of non-listed Cubans or be in violation of international law. *See* Respondent's Statement, pages 2–4 and Exhibit "A"); *see also Legal Fictions Mask Human Suffering: The Detention of the Mariel Cubans Constitutional, Statutory, International Law and Human Considerations,* 62 S.Cal.L.Rev. 1733, 1737 n. 11 (1989). Thus, INS has not determined that it cannot deport petitioner to Cuba.

As to possible deportation to another country, it is the Respondent's position that it is a detainee's responsibility to obtain permission to enter a third country. There is no official obstacle interposed by the Department of Justice to prevent a detainee from identifying such a country through a contact, relative or voluntary agency and Respondent contends that INS encourages such possibilities. Respondent's Statement indicates that INS has not undertaken a general search on behalf of petitioner or any other Mariel Cuban, nor is Respondent aware of any contacts made by petitioner or on his behalf for admission to a third country. *See* Respondent's Statement, pages 4–5 and Exh. "B"). Petitioner has

stated that he explored and requested possible political refugee status in Austria. By letter dated October 16, 1989, the Austrian Consulate General informed petitioner that the Austrian authorities could not grant him such status. (Petitioner's Statement, Attachment).

### DISCUSSION

Petitioner argues that the Attorney General is without authority to detain him; that his detention is contrary to the precepts of established international law; and, that indefinite detention violates his rights under the Fifth and Sixth Amendments of the United States Constitution.

### A. The Attorney General's Authority to Detain Excludable Aliens

■ Congress has plenary power to admit aliens to the United States or, conversely, to bar them. *Kleindienst v. Mandel,* 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972). In its early decisions, the United States Supreme Court recognized that this power to expel or exclude aliens was a fundamental sovereign attribute exercised by the government's political departments. *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953).

■ By statutory enactment, Congress has delegated its broad powers in the immigration field to the Attorney General. *See* 8 U.S.C. § 1103. The statute also classified those persons who are deemed excludable including those persons, like petitioner, who are nonimmigrants not in the possession of a proper passport and, at the time of application, not in possession of a valid nonimmigrant visa or border crossing identification card. 8 U.S.C. §§ 1182(a)(26)(A)–(B). For those aliens who lack the valid documentation and are preliminarily determined to be excludable, Congress has declared that such persons are subject to detention. 8 U.S.C. § 1225(b). Detention is not an inescapable result of exclusion proceedings. Rather, Congress has authorized the Attorney General, *in his discretion,* to grant parole to

any nonadmitted alien whenever he determines such parole to be in the public interest. The statute, noted earlier in this Report, provides in pertinent part:

> "The Attorney General may, ... in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States ..."

8 U.S.C. § 1182(d)(5)(A).

Courts have found that the legislative history of the parole statute provides "that Congress consistently visualized parole as an indulgence to be granted only occasionally, in the case of rare and exigent circumstances, and only when it would plainly serve the public interest." *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir.1987) (Parole is the exception, not the rule.); *see also Mason v. Brooks*, 862 F.2d 190, 194 (9th Cir.1988) (Legislative history of parole provisions indicates Congress intended that temporary admission be granted infrequently.)

Despite the unfettered discretion of the Attorney General allowing him to detain excludable aliens, "[f]or almost thirty years before 1981, INS had followed a policy of general parole for undocumented aliens arriving on our shores and seeking admission to this country. In the late 1970's and early 1980's, however, large numbers of undocumented aliens arrived in South Florida, mostly from Haiti and Cuba. Concerned about this influx of undocumented aliens, the Attorney General in the first half of 1981 ordered the INS to detain without parole any immigrants who could not present a prima facie case for admission. The aliens were to remain in detention pending a decision on their admission or exclusion. This new policy of detention rather than parole was not based on a new statute or regulation. By July 31, 1981, it was fully in operation in south Florida." *Jean v. Nelson*, 472 U.S. 846, 849, 105 S.Ct. 2992, 2994, 86 L.Ed.2d 664 (1985).

Despite the shift in policy favoring detention, petitioner was paroled into the United States. While at liberty, he engaged in a series of criminal acts culminating in his conviction for, among other crimes, second degree murder. Based upon his conviction petitioner's parole was revoked. After his release from state custody, petitioner was found excludable, subject to deportation and detained. While in detention, petitioner's case was reviewed by the Cuban Review Plan which determined that he could not be paroled because of his violent behavior. According to the provisions of the Review Plan, petitioner's case will be reviewed annually to determine whether he is eligible for parole.

Petitioner's challenge to his continued detention is not unique. In *Palma v. Verduyen*, 676 F.2d 100 (4th Cir.1982), an excluded alien subject to deportation who was also part of the Mariel boatlift, or "Freedom Flotilla", contended that the Attorney General had no authority under the immigration laws to continue to detain him indefinitely. The Fourth Circuit Court of Appeals, relying on the Supreme Court's decision in *Mezei*, concluded that "indefinite detention of a permanently excluded alien deemed to be a security risk, who is refused entry to other countries, is not unlawful." *Id.*, at 103. Relying on its analysis of the Attorney General's broad powers regarding parole, the Court reasoned that the Attorney General had implicit authority to detain rather than parole an excluded alien who cannot be returned to his own country. *Id.*, at 104.

The Court also noted that review procedures instituted by the Attorney General complied with 8 U.S.C. § 1227(a) which required the immediate return of an alien *unless* the Attorney General found, in his discretion, that immediate deportation was not practicable or proper. *Id.*, at 104. Not only did the Court find that the Attorney General had the power to detain excludable aliens not fit for parole but also that the review procedures established by the Attorney General distinguished Palma's case from the alien in *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir.1981).[6]

---

**6.** Petitioner in this case also relies extensively on the Court's decision in *Rodriguez–Fernandez.*

In that case, the Tenth Circuit Court of Appeals had affirmed, with modifications, the grant of a writ of habeas corpus to a detainee, who, like Mayet Palma and petitioner in the instant case, had been imprisoned in Cuba for theft when he was allowed to join the flotilla to the United States. The Court in *Palma* found it unnecessary to address the government's argument that *Rodriguez–Fernandez* was incorrectly decided. The Court found it sufficient to note that the Attorney General had determined, unlike Rodriguez–Fernandez, that Mayet Palma's immediate deportation was proper, though impracticable, and that he was not suitable for parole. *Palma*, 676 F.2d at 105.

■ In the instant case, the Attorney General has determined that petitioner, like Palma and unlike Rodriguez–Fernandez, is subject to immediate deportation and unsuitable for parole. The instant case also provides another stark difference between petitioner here and Rodriguez–Fernandez. Upon his arrival in the United States, Rodriguez–Fernandez was immediately detained pending an exclusion hearing. After a hearing, he was found excludable and deportable to Cuba. Cuba had refused all requests to accept him and other members of the flotilla. Pending deportation, Rodriguez–Fernandez was detained first at Leavenworth penitentiary and then transferred to the penitentiary in Atlanta, Georgia. The Tenth Circuit noted that Rodriguez–Fernandez had committed no offenses against the United States. *Rodriguez–Fernandez*, 654 F.2d at 1385. Thus, the Tenth Circuit found that "[w]hen an excludable alien in custody tests the detention by writ of habeas corpus pursuant to 8 U.S.C. § 1105a(a)(9) or 28 U.S.C. § 2241, we hold that the burden is upon the government to show that the detention is still temporary pending expulsion, and not simply incarceration as an alternative to departure." *Id.*, at 1390.

In the instant case, petitioner had been on parole when his criminal acts required

that his parole be revoked and that he be detained. The Attorney General made findings concerning petitioner's continued detention. In addition, the government has met its burden of showing that petitioner's detention is not simply incarceration as an alternative to departure. Petitioner's case is reviewed annually by the Cuban Review Plan to determine his eligibility for parole.

As previously noted, the regulatory procedures governing review by the Cuban Review Panel are set forth at 8 C.F.R. §§ 212.12 through 212.13 (1989). Petitioner had not challenged the determination of the panel regarding any possible due process violations arising from the structure of the review procedures or the implementation of such procedures in his case in his present petition.[7]

Moreover, a request for judicial review of the Panel's final decision will be available to the petitioner through a writ of habeas corpus filed in the District Court. *See* 8 U.S.C. § 1329. While the Court recognizes that it must give great deference to administrative agency findings, the Court would not defer to an administrative agency's determination if the agency has abused its discretion. *Jara–Navarette v. INS*, 800 F.2d 1530, 1531 (9th Cir.1986) (Abuse of discretion in cursory and generalized analysis of factors relevant to application.) Further, it is an axiom of administrative law that an agency must explain the rationale and factual basis for its decisions. *Id., relying on Bowen v. American Hospital Association*, 476 U.S. 610, 626, 106 S.Ct. 2101, 2113, 90 L.Ed.2d 584 (1986). Thus, petitioner may file another habeas corpus petition to challenge the Cuban Review Plan's decision.

Thus, the Magistrate concludes that the Attorney General has the authority to detain petitioner, denying him parole, until his deportation can be effected. In addition, the Magistrate finds that the government has met its burden of showing that petitioner's detention is not indefinite.

---

7. Petitioner's recent Statement attempts to generally present an argument setting forth a due process violation challenge to the decision of the Cuban Review Panel. However, petitioner's Statement, which was not included in the petition, does not set forth any substantive or factual arguments supporting procedural due process violations.

Rather, petitioner's case is reviewed annually to determine whether his conduct merits reparole into the United States pending his deportation.[8]

## B. International Law

■ Petitioner argues that because general principles of international law forbid prolonged arbitrary detention, this Court should find that this current detention is unlawful. Specifically, petitioner contends that the statutes concerning the Attorney General's power to detain excludable aliens are ambiguous and that under such circumstances "[i]t seems proper ... to consider international law principles for notions of fairness as to [the] propriety of holding aliens in detention." (Traverse, page 41, quoting *Rodriguez–Fernandez*, 654 F.2d at 1388.)

The *Rodriguez–Fernandez* decision is not applicable under the facts of the instant case. First, as discussed above, the Tenth Circuit's decision was premised upon review of a case where the Cuban refugee had never committed an offense in the United States, had never been on parole but was immediately and continuously detained upon arrival in the United States, and without information regarding, or consideration of, the Cuban Review Plan.

Second, the *Rodriguez–Fernandez* decision does not analyze the application of international law to the case. Rather, it notes that the Court's interpretation of the applicable statutes is consistent with principles of international law. The Court stated:

"Neither will we read into the statute a specific time limit for detention. Rather, since the statute contemplates temporary detention, we hold that detention is permissible during proceedings to determine eligibility to enter and, thereafter, during a reasonable period of negotiations for their return to the country of origin or to the transporter that brought them here. After such a time, upon application of the incarcerated alien willing to risk the possible alternatives to continued detention, the alien would be entitled to release. This construction is consistent with accepted international law principles that individuals are entitled to be free of arbitrary imprisonment. It is also consistent with the statutory treatment of deportable resident aliens and with ... constitutional principles ..."

*Id.,* at 1389–90.

Thus, the *Rodriguez–Fernandez* decision does not hold that international law provides a separate authority for the alien's release from detention as petitioner contends. Rather, the Court's interpretation of the relevant statutes was found to be *consistent* with accepted principles of international law.

In *Garcia–Mir v. Meese*, 788 F.2d 1446, 1453 (11th Cir.), *cert. denied*, 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986), the Eleventh Circuit Court of Appeals expressly considered the applicability of international law in cases involving the Mariel Cubans and found it to be inapplicable. Quoting *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900), the Court stated: "The public law of nations was long incorporated into the common law of the United States. ... But public international law is controlling only 'where there is no treaty and no controlling executive or legislative act or judicial decision ...'." *Garcia–Mir*, 788 F.2d at 1453. After rejecting similar arguments and in-

---

**8.** The government has noted another decision, in addition to *Rodriguez–Fernandez*, which found that a Cuban refugee detained pending deportation should be released. In *Gallegos v. INS*, 663 F.Supp. 517 (W.D.Wis.1987), the District Court, relying on the decision in *Rodriguez–Fernandez*, found that the Immigration and Nationality Act permits only temporary detention of excludable aliens. *Id.,* at 527. The government was given an additional opportunity to establish that Gallegos' detention was temporary by showing, *inter alia,* that it has proce-

dures in place by which Gallegos' eligibility for parole will be considered periodically. *Id.,* at 528.

In a subsequent decision, *Gallego v. INS*, 674 F.Supp. 280 (W.D.Wis.1987), the District Court found that the Cuban Review Plan demonstrated that Gallegos' detention was temporary. Accordingly, the writ of habeas corpus was denied for Gallegos' failure to show that his detention was in violation of any provision of the United States Constitution or the laws of the United States. *Id.,* at 288.

terpretations of decisions and treatises as those submitted by petitioner in this case, the Eleventh Circuit Court of Appeals concluded that the executive acts of the Attorney General to terminate the status review plan (a precursor to the Cuban Review Plan) and to incarcerate indefinitely pending efforts to deport, constituted a sufficient basis for affirming the trial court's finding that international law does not control. *Garcia–Mir*, 788 F.2d at 1454–55. Furthermore, the Eleventh Circuit noted that in its prior decision in *Jean v. Nelson*, 727 F.2d 957, 974–75 (11th Cir.1984), *affirmed on other grounds*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1983), it found that the Supreme Court's decision in *Mezei* held that even an indefinitely incarcerated alien "could not challenge his continued detention without a hearing." Thus, the *Garcia–Mir* Court relied on its prior decision as a sufficient controlling judicial basis to meet the test of *The Paquete Habana*, finding international law to be inapplicable to the controversy. *Garcia–Mir*, 788 F.2d at 1455.

In reliance on the Eleventh Circuit's decision in *Garcia–Mir v. Meese*, the Magistrate concludes that international law is inapplicable to the instant case.

*C. Alleged Violations of the Fifth Amendment to the United States Constitution*

██ Petitioner contends that his continued detention is in violation of his liberty interest and due process rights under the Fifth Amendment of the United States Constitution.

It is beyond dispute that aliens have no constitutional right to admission into the United States. *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21, 32 (1982). The Eleventh Circuit, a Court of Appeals that has had numerous detention challenges from both Cuban and Haitian refugees, analyzed the corollary to the admissions versus parole question. In *Fernandez–Roque v. Smith*, 734 F.2d 576, 581 (11th Cir.1984), the Court noted that if parole constitutes part of the admissions process, rather than a separate benefit,

there would be no constitutional right to parole as well. In analyzing this premise, the Court referred to its prior consideration of the same issues in *Jean v. Nelson*. In *Jean*, the Court considered challenges by Haitian refugees that the government's parole policy was racially discriminatory and violated their equal protection rights under the Fifth Amendment to the United States Constitution. After an exhaustive analysis, the Court in *Jean* found that there was no distinction between parole and admission for purposes of considering claims under the Constitution. *Jean*, 727 F.2d at 969. Thus, in *Jean*, the Court concluded that "excludable aliens cannot challenge either admission or parole decisions under a claim of constitutional right." *Id.*, at 972.

Relying on their decision in *Jean*, as well as the Supreme Court's decision in *Mezei*, the Court in *Fernandez–Roque* concluded that parole is part of the admissions process. The Court stated:

"As such, its denial or revocation does not rise to the level of a constitutional infringement. [note omitted] Because the Cubans lack a constitutional liberty interest, we need not reach the question of whether the Attorney General's plan satisfies due process."

*Fernandez–Roque*, 734 F.2d at 582.

Since the Court had found that the Cuban refugees could not raise any constitutionally based liberty interests, the refugees sought to have the Court determine whether some actionable liberty interest exists, not based on a core value of the Due Process Clause, but one which is nonetheless protected by the Fifth Amendment's guarantee of due process of law. In analyzing this argument, the Court noted that "[i]t is always prudent for a court to avoid decision on a constitutional question when alternate grounds exists for resolving the case." *Garcia–Mir*, 788 F.2d at 1450, *referring to Spector Motor Co. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). Therefore, the Court decided the issue on more narrow grounds and avoided the constitutional questions of whether unadmitted aliens

have actionable nonconstitutionally-based due process rights. The Court determined that the Cuban refugees are entitled to no relief on their claims of a nonconstitutionally based liberty interest. *Id.*, at 1455.

█ The Magistrate similarly concludes that petitioner has no constitutional or nonconstitutionally based liberty interests under the Fifth Amendment. However, petitioner may challenge the Cuban Review Panel regulations based on procedural due process grounds.

### D. Alleged Violations of Sixth Amendment Rights

█ Petitioner contends that his continued detention violates the Sixth Amendment of the United States Constitution. Specifically, petitioner argues that he has been imprisoned without a trial and has not been afforded, generally, those Sixth Amendment rights provided to persons accused of criminal activity. (Traverse, pages 13–21).

█ Petitioner confuses those Sixth Amendment and other constitutional rights afforded under circumstances other than immigration matters. While it is clear that excludable aliens cannot challenge the admissions process or parole decisions under a claim of constitutional right, *Jean*, 727 F.2d at 972, petitioner is afforded the same constitutional rights as resident aliens or citizens of the United States under other circumstances. For example, "aliens can raise constitutional challenges to deprivations of liberty or property interests outside the context of entry or admission, when the plenary authority of the political branches is not implicated." *Jean*, 727 F.2d at 972; *see e.g. Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) ("[A]liens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law.") Even non-resident aliens are entitled to the protection of the Fifth Amendment's prohibition on unlawful takings. *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491, 51 S.Ct. 229, 232,

75 L.Ed. 473 (1931). "When the government seizes the property of foreign nationals within this country, its actions do not fall within a sphere of plenary executive and legislative authority, and it therefore cannot claim that the aliens involved are entitled only to the degree of due process that Congress is prepared to extend them as a matter of law." *Jean*, 727 F.2d at 973.

█ This separation of activities where there are no constitutional rights, *i.e.*, regarding admission and parole, and circumstances where aliens do have rights also applies in the context of criminal proceedings. For example, an excludable alien is entitled to *Miranda* rights. *United States v. Henry*, 604 F.2d 908, 914 (5th Cir.1979). An excludable alien is also entitled to raise arguments concerning the effectiveness of his counsel in a criminal proceeding. *See Santos v. Kolb*, 880 F.2d 941 (7th Cir.1989); *United States v. Gavilan*, 761 F.2d 226 (5th Cir.1985). However, it must be emphasized that these rights are afforded within the context of criminal prosecutions only. "When the government subjects an alien to the criminal process it is plainly no longer seeking to effectuate its power to control admission into the United States by removing the alien from this country." *Jean*, 727 F.2d at 973. When the action of the government although appearing to touch on an alien's rights as afforded by the Sixth Amendment, clearly involves immigration matters, he or she has no basis for a constitutional challenge. For example, aliens may be arrested without a warrant for deportation purposes. *Abel v. United States*, 362 U.S. 217, 233–34, 80 S.Ct. 683, 694–95, 4 L.Ed.2d 668 (1960). Aliens may also be deported for illegal behavior that occurred before Congress outlawed the behavior since deportation is not considered punishment under the *ex post facto* clause of the Constitution. *Harisiades v. Shaughnessy*, 342 U.S. 580, 594–95, 72 S.Ct. 512, 521–22, 96 L.Ed. 586 (1952).

Thus, petitioner was entitled to the full panoply of Sixth and Fifth Amendment rights afforded to an accused when he was charged *within the context of a criminal*

*proceeding.* Petitioner was afforded all of those rights upon being charged with crimes while at liberty. Petitioner received due process when he was arrested, charged, and convicted in Florida. However, the instant challenge, involving admission and parole, which includes petitioner's challenges to continued detention, does not provide the protection afforded under the Sixth and Fifth Amendments.

## CONCLUSION

The Magistrate has carefully reviewed and considered petitioner's allegations and arguments. However, the Magistrate concludes that petitioner's continued detention does not violate the Fifth and Sixth Amendments to the United States Constitution; that principles of international law are inapplicable; and, that the Attorney General has authority to detain the petitioner.

Accordingly, the Magistrate recommends that petitioner's application for a writ of habeas corpus be denied.

DATED: This 19th day of March, 1990.