Hector SANCHEZ, Petitioner,

v.

Warden T.R. KINDT, Respondent.

No. TH 90–105–C.

United States District Court, S.D. Indiana, Terre Haute Division.

Dec. 4, 1990.

Hector Sanchez, pro se.

Jill E. Zengler, Asst. U.S. Atty., Office of U.S. Atty., Indianapolis, Ind., for respondent.

**ENTRY DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DIRECTING ENTRY OF JUDGMENT**

McKINNEY, District Judge.

This cause is before the Court on the petition of Hector Sanchez for a writ of habeas corpus, on the petitioner's amended petition, on the respondent's answer and return and on the respondent's memorandum opposing habeas corpus petition.

Whereupon the Court, having read and examined such petitions, answer and return and memorandum, having considered the petitioner's claim and the arguments of the parties and being duly advised, now finds that the petitioner is not entitled to the relief he seeks in this action and that his petition for habeas corpus relief should accordingly be denied and this cause of action dismissed with prejudice.

I.

Introduction

In this and companion cases this Court enters the fray engendered by the complex and longlasting fallout from the Cuban Mariel Boatlift of over a decade ago. In resolving the issues presented here the

Court does not break new ground, but draws on the analyses and conclusions of many other courts.

### Background

Petitioner is confined at the United States Penitentiary at Terre Haute, Indiana. He is an excludable alien who arrived in this Country during the 1980 Mariel Boatlift.[1] Cuba has not agreed to take him back.[2]

He was initially released on immigration parole.[3] While in that status he was convicted of one or more felonies. His prison sentences have now been fully served. He presents three claims in this action: 1) the Attorney General does not have the authority to detain him indefinitely; 2) he has a liberty interest in freedom from detention and the denial and revocation of parole are effected without due process of law; and 3) his prolonged detention violates customary international law and is therefore illegal.

### II.

#### A. Jurisdictional Basis for this Action

■ The petitioner brings this action for habeas corpus relief. The specific provision through which we may review the petitioner's claims in this action, however, is found at 8 U.S.C. § 1329:

> The district courts of the United States shall have jurisdiction of all causes, civil and criminal, arising under any of the provisions of this title [Title 8].

The specific terms of this statute supplement, rather than supplant, the general language of the federal habeas corpus statute and the respondent has not challenged the form in which the petitioner's claims have been presented.[4]

#### B. Authority of Attorney General to Detain Indefinitely

■ It is every nation's prerogative "to determine whether, and in what numbers, outsiders without any cognizable connection to this society shall be permitted to join it." *Garcia–Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir.1985). This power is an inherent attribute of national sovereignty. *Fong Yue Ting v. United States*, 149 U.S. 698, 707–11, 13 S.Ct. 1016, 1019–21, 37 L.Ed. 905 (1893); *Nishimura Ekiu v. United States*, 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892).

■ Congress has plenary power to admit aliens to the United States or, conversely, to bar them. *Kleindienst v. Mandel*, 408 U.S. 753, 766, 92 S.Ct. 2576, 2583,

---

1. "In early April 1980, some 10,800 Cuban citizens claiming status as political refugees sought sanctuary in the Peruvian Embassy in Havana. On April 14, 1980, President Carter declared that, pursuant to the Refugee Act of 1980, up to 3,500 of these refugees would be admitted into the United States. He allocated up to $4.25 million for their resettlement. 45 Fed.Reg. 28079 (April 28, 1980). An airlift was started but within three days Castro stopped the flights, announcing that anyone who wanted to leave could do so through the harbor at Mariel. Almost immediately, small boats, funded by members of the Cuban–American community, began leaving Key West." *United States v. Frade*, 709 F.2d 1387, 1389 (11th Cir.1983). In the Mariel Boatlift, or "Freedom Flotilla," by which some 114,000 Cuban refugees, in nearly 1,800 boats, crossed the ninety miles of ocean between Cuba and the United States. *See Alonso Martinez v. Meissner*, 697 F.2d 1160, 1161 n. 4 (D.C.Cir. 1983).

2. "The government of Cuba has not refused to accept the Mariel excludables as a group. However, the government of Cuba is currently accepting for repatriation only those Mariel excludables who appear on a list of 2,746 named individuals which INS identified in December of 1984 as warranting efforts to enforce their departure from the United States because of their serious criminal activities or serious mental infirmities." *Alvarez–Mendez v. Stock*, 746 F.Supp. 1006, 1010 (C.D.Ca.1990).

3. Section 212(d)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1182(d)(5), provides that the Attorney General may in his discretion temporarily parole an alien applying for admission to the United States.

4. 28 U.S.C. § 2241 provides that:

 (a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.
 . . . .
 (c) The writ of habeas corpus shall not extend to a prisoner unless—
 . . . .
 (3) He is in custody in violation of the Constitution or laws or treaties of the United States. . . .

33 L.Ed.2d 683 (1972). The power to expel or exclude aliens is a fundamental sovereign attribute exercised by the government's political departments. *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953). By statutory enactment, Congress has delegated broad powers in the immigration field to the Attorney General. *See* 8 U.S.C. § 1103. Congress has also identified a number of classes of persons who are deemed excludable. 8 U.S.C. § 1182(a)(1)–(33).[5] A portion of the Immigration and Nationality Act (INA), 8 U.S.C. § 1182(a), provides as follows:

> Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States.

> . . . .

> (9) Aliens who have been convicted of a crime involving moral turpitude....

> (20) [A]ny immigrant who at the time of application for admission is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter....

> (23) Any alien who—

> (A) has been convicted of a violation of, or a conspiracy to violate, any law or regulation of a State, the United States, or a foreign country relating to a controlled substance....

The INA directs the immediate deportation of excluded aliens, unless the Attorney General determines that immediate deportation is not practicable or proper, in which event the excluded alien can be either released to immigration parole or detained. 8 U.S.C. § 1227.

With respect to the treatment of excludable aliens, Congress has delegated the following authority to the Attorney General:

> The Attorney General may, except as provided in subparagraph (B), in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A). "[A]s originally conceived by the enacting Congress, parole was meant to be the exception rather than the rule. It was to be catalyzed only by the existence of an emergency (whether a personal emergency, such as an alien's medical needs, or a public emergency, such as a national need to have the alien present within the country). This view, though rigid, was well within the legislature's choice of prerogatives." *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir.1987). The mere granting of parole "shall not be regarded as an admission of the alien ...," 8 U.S.C. § 1182(d)(5)(A), and in the event of revocation of parole, the alien shall "be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.*

This statutory scheme is not at issue in this action, nor is the petitioner's status as

---

**5.** Excludable aliens are those who seek admission but have not been granted entry into the United States. Even if physically present in this country, they are legally considered detained at the border. This is known as the "entry fiction." A necessary part of this statutory scheme is that neither parole nor detention of excludable aliens, nor the duration of their physical presence in the country, can have any effect on their status. *Leng May Ma v. Barber*, 357 U.S.

185, 188, 78 S.Ct. 1072, 1074, 2 L.Ed.2d 1246 (1985). They continue to "have no constitutional rights with regard to their applications, and must be content to accept whatever statutory rights and privileges they are granted by Congress." *Jean v. Nelson*, 727 F.2d 957, 968 (11th Cir.1984) *(en banc), affirmed on other grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). *See generally Garcia–Mir v. Smith,* 766 F.2d 1478, 1483–84 (11th Cir.1985).

"an excludable or potentially excludable alien." [6]

■■■■ There is no explicit statutory limit to the length of time which such a person can be detained. What is at issue, with respect to the first claim, is the Attorney General's authority to detain excludable aliens indefinitely.

The Seventh Circuit Court of Appeals has addressed this issue only obliquely. In *Ramos v. Haig*, 716 F.2d 471 (7th Cir.1983), the Court reviewed the denial of attorney fees under the Equal Access to Justice Act of counsel who had prevailed in the district court in securing habeas corpus relief for two juveniles who had been detained without hearing for 15 months following their arrival in this Country as part of the Mariel Boatlift. The Court found that "the sole question before this court is whether the government's long-term confinement of petitioners is "substantially justified," *id.*, 716 F.2d at 473 n. 3, which exists when the government demonstrates that its action had a reasonable basis in law and fact. The Court reviewed the applicable law in the following terms:

> Pursuant to 8 U.S.C. Sec. 1225(b), an examining immigration officer must detain, for further inquiry, all aliens "who may not appear to the examining officer to be clearly and beyond a doubt entitled to land." Generally, examining immigration officers detain aliens whom they believe to be "excludable", as defined by 8 U.S.C. Sec. 1182. These aliens are processed and assigned to various detention centers while INS conducts an investigation. Thereafter, a special inquiry officer conducts a hearing and decides whether aliens "shall be allowed to enter or shall be excluded and deported." 8 U.S.C. Sec. 1226.
>
> Thousands of aliens arrived in our country as part of the "Cuban flotilla", approximately 2,000 of these aliens had backgrounds which warranted detention pending further inquiries. Consequently, INS assumed the responsibility of

processing, detaining, and investigating a large number of aliens. These responsibilities were necessarily time consuming. Information concerning an alien's past criminal background in a foreign land is often difficult to obtain. Still, INS was able to parole a majority of these detainees within one year. Thus, we must accept the district court's findings that INS's general confinement of aliens for further inquiry was reasonable. With regard to INS's long-term detention of petitioners, we note that the circumstances which justify such detention are uncertain. The Immigration and Naturalization Act does not expressly limit the time in which INS must complete its investigations, thus, INS's legal position that it may indefinitely detain aliens awaiting exclusion hearings is not foreclosed by the Act.

*Id.*, 716 F.2d at 474. It then found, in conformity with its limited review under the EAJA, that the district court's finding that the government's legal position was substantially justified, *i.e.*, reasonable, was not clearly erroneous. In *Santos v. Kolb*, 880 F.2d 941 (7th Cir.1989), the Court considered the habeas corpus claim of a state prisoner whose attorney had failed to advise the petitioner of the collateral consequences of a felony conviction (i.e., deportation) constituted ineffective assistance of counsel. The Court described the procedure which is at issue in this action:

> Under 8 U.S.C. § 1182(a)(9), an alien may be deported or excluded if convicted of a crime of "moral turpitude" ... Both deportation and exclusion generally result in the involuntary removal of the alien to his or her country of origin. If the country of origin will not accept the alien, he or she may be released on immigration parole or subjected to indefinite confinement in federal custody as a result of a final deportation (or exclusion) order.

*Id.*, 880 F.2d at 942 n. 3.

Our Court of Appeals cannot be said to have squarely decided this issue. In *Ra-*

**6.** Pursuant to 8 U.S.C. § 1182(d)(5), petitioner was paroled into the United States. That parole was revoked following the expiration of his criminal sentence. He states in the affidavit

attached to his petition that he is "not certain if a final order of exclusion has been entered against [him] but the government considers [him] to be an excludable alien."

*mos, supra,* it concluded only that the government's position had a reasonable basis in law. It specifically "express[ed] no opinion regarding the correctness of the government's legal interpretations." 716 F.2d at 474. A stronger and seemingly unqualified statement was made in *Santos v. Kolb,* 880 F.2d 941, 942 n. 3 (7th Cir. 1989):

> Both deportation and exclusion generally result in the involuntary removal of the alien to his or her country of origin. If the country of origin will not accept the alien, he or she may be released on immigration parole or subjected to indefinite confinement in federal custody as a result of a final deportation (or exclusion) order.

Nonetheless, the habeas petitioner in *Santos* did not challenge an immigration determination or process, he was not in INS custody and the Court of Appeals did not undertake any analysis of the applicable statutes in stating that an excludable alien who could not be deported could be subjected to indefinite confinement. Therefore, although this Court perceives some support for the respondent's position in this action from the Court of Appeals, it is appropriate to consider other authorities in addressing this issue.

The petitioner relies on the decision of the Tenth Circuit in *Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382 (10th Cir. 1981), for the proposition that "the [INA] does not implicitly authorize indefinite detention of excludable aliens." *Habeas Petition* at p. 15. According to the petitioner, in *Rodriguez–Fernandez* the Court determined that "Section 1227 contemplates only temporary detention of excludable aliens, during admission proceedings and for a reasonable period of time thereafter to allow negotiations for return to the country of origin or to the initial transporter. After that, the aliens are entitled to be released." *Id.,* at pp. 15–16.

Just as the petitioner relies on and the respondent eschews the Tenth Circuit's decision in *Rodriguez–Fernandez,* the parties' positions are reversed with respect to the decisions of the Fourth and Eleventh Circuits in *Palma v. Verdeyen,* 676 F.2d 100 (4th Cir.1982), and *Jean v. Nelson,* 727 F.2d 957, 968 (11th Cir.1984) (*en banc*), *affirmed on other grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985).

In resolving the argument concerning these arguably conflicting decisions, the Court has examined the authorities cited by the parties and given due consideration to the statutory scheme which must be construed, to the policies underlying the statute and to the interests which can be asserted in support of both the petitioner's and the government's positions. The Court finds that District Judge Hill's decision in *Alvarez–Mendez v. Stock,* 746 F.Supp. 1006 (C.D.Cal.1990), adopting a magistrate's revised report and recommendation, is both correct and completely persuasive on this point. The petitioner in *Alvarez–Mendez* had a background similar to the petitioner's here: he arrived in Florida by boat from Mariel, Cuba in May 1980; he was granted immigration parole pursuant to 8 U.S.C. § 1182(d)(5); he remained at liberty until convicted of criminal offenses in the United States; and after completing service of his criminal sentence his immigration parole was revoked by the INS and he was detained pending exclusion and deportation proceedings. The Court's discussion of this point was the following:

> Petitioner's challenge to his continued detention is not unique. In *Palma v. Verdeyen,* 676 F.2d 100 (4th Cir.1982), an excluded alien subject to deportation who was also part of the Mariel boatlift, or "Freedom Flotilla", contended that the Attorney General had no authority under the immigration laws to continue to detain him indefinitely. The Fourth Circuit Court of Appeals, relying on the Supreme Court's decision in [*Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953)], concluded that "indefinite detention of a permanently excluded alien deemed to be a security risk, who is refused entry to other countries, is not unlawful." *Id.,* at 103. Relying on its analysis of the Attorney General's broad powers regarding parole, the Court reasoned that the Attorney General had im-

plicit authority to detain rather than parole an excluded alien who cannot be returned to his own country. *Id.,* at 104.

The Court also noted that review procedures instituted by the Attorney General complied with 8 U.S.C. § 1227(a) which required the immediate return of an alien unless the Attorney General found, in his discretion, that immediate deportation was not practicable or proper. *Id.,* at 104. Not only did the Court find that the Attorney General had the power to detain excludable aliens not fit for parole but also that the review procedures established by the Attorney General distinguished Palma's case from the alien in *Rodriguez–Fernandez v. Wilkinson,* 654 F.2d 1382 (10th Cir.1981). *Alvarez–Mendez v. Stock,* 746 F.Supp. 1006, 1011 (C.D.Cal.1990). The Court then discussed and distinguished *Rodriguez–Fernandez:*

> In that case, the Tenth Circuit Court of Appeals had affirmed, with modifications, the grant of a writ of habeas corpus to a detainee, who, like Mayet Palma and petitioner in the instant case, had been imprisoned in Cuba for theft when he was allowed to join the flotilla to the United States. The Court in *Palma* found it unnecessary to address the government's argument that Rodriguez–Fernandez was incorrectly decided. The Court found it sufficient to note that the Attorney General had determined, unlike Rodriguez–Fernandez, that Mayet Palma's immediate deportation was proper, though impracticable, and that he was not suitable for parole. *Palma,* 676 F.2d at 105.

Petitioner in this case also relies extensively on the Court's decision in *Rodriguez–Fernandez.* In the instant case, the Attorney General has determined that petitioner, like Palma and unlike Rodriguez–Fernandez, is subject to immediate deportation and unsuitable for parole. The instant case also provides another stark difference between petitioner here and Rodriguez–Fernandez. Upon his arrival in the United States, Rodriguez–Fernandez was immediately detained pending an exclusion hearing. After a hearing, he was found excludable and deportable to Cuba. Cuba had refused all requests to accept him and other members of the flotilla. Pending deportation, Rodriguez–Fernandez was detained first at Leavenworth penitentiary and then transferred to the penitentiary in Atlanta, Georgia. The Tenth Circuit noted that Rodriguez–Fernandez had committed no offenses against the United States. *Rodriguez–Fernandez,* 654 F.2d at 1385. Thus, the Tenth Circuit found that "[w]hen an excludable alien in custody tests the detention by writ of habeas corpus pursuant to 8 U.S.C. § 1105a(9) or 28 U.S.C. § 2241, we hold that the burden is upon the government to show that the detention is still temporary pending expulsion, and not simply incarceration as an alternative to departure." *Id.,* at 1390.

In the instant case, petitioner had been on parole when his criminal acts required that his parole be revoked and that he be detained. The Attorney General made findings concerning petitioner's continued detention. In addition, the government has met its burden of showing that petitioner's detention is not simply incarceration as an alternative to departure. Petitioner's case is reviewed annually by the Cuban Review Plan to determine his eligibility for parole.

As previously noted, the regulatory procedures governing review by the Cuban Review Panel are set forth at 8 C.F.R. §§ 212.12 through 212.13 (1989). Petitioner had not challenged the determination of the panel regarding any possible due process violations arising from the structure of the review procedures or the implementation of such procedures in his case in his present petition....

Thus, the Magistrate concludes that the Attorney General has the authority to detain petitioner, denying him parole, until his deportation can be effected. In addition, the Magistrate finds that the government has met its burden of showing that petitioner's detention is not indefinite. Rather, petitioner's case is reviewed annually to determine whether

his conduct merits reparole into the United States pending his deportation.

The Court then found further support for its conclusion in *Gallego v. INS*, 663 F.Supp. 517 (W.D.Wis.1987), and its sequel. *Gallego v. INS*, 674 F.Supp. 280 (W.D.Wis. 1987). In these actions the district court, relying on the decision in *Rodriguez–Fernandez*, found that the INA permits only temporary detention of excludable aliens, 663 F.Supp. at 527, but subsequently determined that the annual review of the alien's status (as detained) under the Cuban Review Plan actually rendered the detention temporary and not indefinite. 674 F.Supp. at 288. Because the detention was temporary rather than permanent it did not support the petitioner's contention that it was violative of the Constitution or laws of the United States. The Cuban Review Plan, 8 C.F.R. §§ 212.12–212.13 (1989), is attached to this Entry as Appendix I.

The conclusion of this Court is in accord with *Alvarez–Mendez*. Specifically, we find the following: (1) the INA does authorize the indefinite detention of excludable aliens; (2) the decision of the Tenth Circuit in *Rodriguez–Fernandez* is contrary to the better authority in cases such as *Jean v. Nelson*, 727 F.2d 957, 968 (11th Cir.1984) (*en banc*), *affirmed on other grounds*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), and *Palma v. Verdeyen*, 676 F.2d 100 (4th Cir.1982); (3) the decision of the Tenth Circuit in *Rodriguez–Fernandez* is distinguishable on its facts from the instant case because the petitioner will receive at least annual reviews of his status. Thus, wholly apart from the legal conclusion which is reached with respect to the duration of detention pursuant to 8 U.S.C. § 1182(d)(5)(A), the petitioner's detention is not indefinite.

### C. Due Process Claim

The petitioner alleges in Count II of his petition that he has a liberty interest "in freedom from detention" based on each and all of the following:

a) his unextinguished right to bodily freedom;

b) promises extended by the United States as it received members of the Freedom Flotilla, including especially President Carter's welcome with "open heart and open arms";

c) the INS policy of "paroling" Freedom Flotilla arrivals and others into this country despite their formal excludable status, embodied in regulations at 8 C.F.R. § 212.5;

d) international law guaranteeing freedom from unreasonable restraint;

e) claims to political asylum; and

f) "other sources of an interest in freedom from restraint."

The petitioner's claims in Count II are without merit and his arguments in support of them, which hinge the *inapplicability* of the entry fiction, are based either on misconceptions or distortions.

■ *The Fifth Amendment Guarantee of Due Process*. In relation to the due process guarantee of the Fifth Amendment, the petitioner states in his brief that "[p]rovisions of the Constitution 'are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality.'" *Habeas Petition* at p. 17, citing *Yick Wo v. Hopkins*, 118 U.S. 356, 367, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). This statement must be reconciled with the Supreme Court's holdings that "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982).

The authority relied on by the petitioner, which is not well-developed or applied to the particular claim which he makes, was found persuasive by the Second Circuit Court of Appeals in *United States ex rel. Mezei v. Shaughnessy*, 195 F.2d 964, 967 (2d Cir.1952), *rev'd*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). It rests on the refusal to apply the entry fiction to decisions when determining the rights of an excludable alien challenging the denial of immigration parole pursuant to Section 212(d)(5) of the INA.

In *Mezei,* an alien was refused entry into the United States. No other country agreed to accept him. He had been denied parole and confined on Ellis Island for twenty-one months when he petitioned for a writ of habeas corpus. The gravamen of Mezei's complaint was clearly not the government's right to exclude him—a permanent exclusion order had already been entered in his case, and he did not contest it in his habeas petition—but the power of the government to continue to detain him without a hearing pending his deportation. *See Mezei,* 345 U.S. at 207, 73 S.Ct. at 627.

The Supreme Court, however, found the entry doctrine fiction applicable under these circumstances:

> Neither respondent's harborage on Ellis Island nor his prior residence here transforms this into something other than an exclusion proceeding. Concededly, his movements are restrained by authority of the United States, and he may by habeas corpus test the validity of his exclusion. But that is true whether he enjoys temporary refuge on land ... or remains continuously aboard ship.... In sum, harborage at Ellis Island is not an entry into the United States.... [and] such temporary harborage, an act of legislative grace, bestows no additional rights.... And this Court has long considered such temporary arrangements as not affecting an alien's status; he is treated as if stopped at the border.

*Id.,* 345 U.S. at 213, 215, 73 S.Ct. at 629, 631 (citations and footnotes omitted).

The Eleventh Circuit applied this in *Fernandez–Roque v. Smith,* 734 F.2d 576, 581 (11th Cir.1984):

> Based on *Jean* and *Mezei,* we are compelled to conclude that *parole is part of the admissions process.* As such, its denial or revocation does not rise to the level of a constitutional infringement.

*See also Pierre v. United States,* 547 F.2d 1281, 1283, 1289–90 (5th Cir.) (entry doctrine fiction applied to aliens seeking parole pending decision on petition for asylum), *vacated and remanded to consider mootness,* 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977); *Ahrens v. Rojas,* 292 F.2d at 408–11 (entry doctrine bars excludable alien from claiming fifth amendment rights to a hearing on the revocation of his parole). This Court therefore concludes that there is no viable basis in the due process clause of the Fifth Amendment itself which provides the petitioner the right to freedom from detention which he asserts.

■ A protected liberty interest may also arise from a nonconstitutional source, *i.e.,* federal statutes or binding regulations. The Supreme Court has recently reviewed the circumstances such an interest is created:

> Stated simply, "a State creates a protected liberty interest by placing substantive limitations on official discretion." *Olim v. Wakinekona,* [461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983).] A State may do this in a number of ways. Neither the drafting of regulations nor their interpretation can be reduced to an exact science. Our past decisions suggest, however, that the most common manner in which a State creates a liberty interest is by establishing "substantive predicates" to govern official decision-making, *Hewitt v. Helms,* [459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) ], and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met.

*Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 1909, 104 L.Ed.2d 506 (1989).

■ The petitioner has identified seven sources of a right to freedom from detention: a) his unextinguished right to bodily freedom; b) promises extended by the United States as it received members of the Freedom Flotilla, including especially President Carter's welcome with "open heart and open arms"; c) the INS policy of "paroling" Freedom Flotilla arrivals and others into this country despite their formal excludable status, embodied in regulations at 8 C.F.R. § 212.5; d) international law guaranteeing freedom from unreasonable restraint; e) claims to political asylum; and f) "other sources of an interest in freedom from restraint." These asserted sources will be considered separately. The phrase

"unextinguished right to bodily freedom" is more of a conclusion or principle than a purported source of any cognizable interest. If this is based on the Constitution, it fails for the reasons already discussed.

■ The second asserted source, promises extended "by the United States" and including the "open heart and open arms" welcome of President Carter, was considered and rejected as a nonconstitutional source of liberty from detention in *Garcia–Mir v. Meese,* 788 F.2d 1446 (11th Cir.), *cert. denied,* 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986). The Eleventh Circuit disposed of this argument in emphatic and practical language:

> Appellees provide us with no precedent or logical basis for the proposition that the President or one of his subordinates can, through written or oral public statements alone, create actionable liberty interests. The long-range implications of such a holding would be both profound and dangerous. It is a hallmark of our system of government that certain rights and liberties are enshrined in the social compact. These guarantees may be expanded or contracted through any of several constitutionally provided-for processes. But to give countenance to the notion that one of the political branches can simply wave a magic wand and "create" (and by implication extinguish) constitutional rights would be to undo completely the notion of limited government through separated, checked and balanced powers. This is a step we decline to take.

*Garcia–Mir v. Meese,* 788 F.2d at 1451 (footnote omitted). Additionally, other than the mere reference to this category the petitioner provides no specific statement of the content or substance of promises or how they should or could affect his status.

■ The third asserted source for the petitioner's liberty from detention is "the INS policy of 'paroling' Freedom Flotilla arrivals and others into this country despite their formal excludable status, embodied in regulations at 8 C.F.R. § 212.5." This Court does not construe the Cuban

Review Plan as compelling the parole of all or of particular excludable aliens. Nor do the factors identified in 8 C.F.R. § 212.5 constitute binding criteria, the application of which mandate that a specific outcome be reached. This regulation provides:

(a) In determining whether or not aliens who have been or are detained in accordance with § 235.3(b) or (c) will be paroled out of detention, the district director should consider the following:

(1) The parole of aliens who have serious medical conditions in which continued detention would not be appropriate would generally be justified by "emergent reasons";

(2) The parole of aliens within the following groups would generally come within the category of aliens for whom the granting of the parole exception would be "strictly in the public interest", provided that the aliens present neither a security risk nor a risk of absconding:

(i) Women who have been medically certified as pregnant;

(ii) Aliens who are defined as juveniles [in some circumstances]

(iii) Aliens who have close family relatives in the United States (parent, spouse, children, or siblings who are United States citizens or lawful permanent resident aliens) who are eligible to file, and have filed, a visa petition on behalf of the detainee;

(iv) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States;

(v) Aliens whose continued detention is not in the public interest as determined by the district director.

(3) Aliens subject to prosecution in the United States who are needed for the purposes of such prosecution may be paroled to the custody of the appropriate responsible agency or prosecuting authority.

8 C.F.R. § 212.5(a) (1986). The petitioner does not argue that any of these factors could be found applicable to his case. Immigration parole for excludable aliens, even in light of the Cuban Review Plan, contin-

ues to be a highly discretionary program which does not entitle the petitioner to his freedom.

The petitioner's fourth claim, that international law guarantees freedom from unreasonable restraint, is asserted as a separate basis for relief in this action and is considered in a separate portion of this opinion.

■■■ The petitioner's fifth claim, that a liberty interest exists through "claims to political asylum," makes no sense either factually or legally in this action. First, the petitioner has not alleged that he has sought political asylum or that any of the procedures for attaining refuge through that path have not been made available to him. Thus, there is no occasion for even exploring whether there is a protected interest in either seeking or obtaining political asylum under these circumstances. Second, there is no suggestion of how an application for political asylum would entitle an alien to immigration parole rather than detention while his exclusion is considered or carried out. And third, few decisions could be further removed from the spectrum of judicial inquiry than the operation of this Nation's willingness or ability to grant political asylum. We find it entirely beyond review and entirely beyond the legal claims even arguable supported by the present petition.

■■■ The last asserted source of a right to be free from detention is "other sources of an interest in freedom from restraint." As a catch-all phrase this is perfectly suitable. As a basis for a nonconstitutional source of a liberty interest in the context of the petitioner's situation it is nothing but empty rhetoric. There is no way for this or any court to make any meaningful assessment of this factor because its meaning is impossible to discern and it need not be considered further.

■■■ The petitioner also alleges that denials and revocations of immigration parole by the INS are effected without due process of law with respect to the following:

 a) notice of all relevant charges;

 b) opportunity to face and cross-examine accusers;

 c) opportunity to call witnesses in opposition to factual claims of the government;

 d) allocation of the burden of proof to the government;

 e) hearing by impartial decision-maker(s);

 f) right to counsel;

 g) other guarantees required by procedural due process.

It would have been useful for the petitioner to provide some content in relation to these claims. However, this defect is not so severe as to prevent resolution of this claim.

The procedures and rights which the petitioner identifies in this list are available only if the Constitution, Congress or the executive (through its binding regulations) have mandated them. As has been seen, the only arguable requirement (in the context of parole/detention decisions) for some of these procedures is in the Cuban Review Plan. The petitioner does not claim that his immigration parole was revoked in the absence of any procedure which that Plan prescribes. He is entitled to no greater protection and thus there is no basis for relief from this laundry list of procedural due process protections which he claims.

■■■ *The Protections of the Sixth Amendment.* The petitioner also refers to the Sixth Amendment in Count II of his petition. Petitioner contends that his continued detention violates the Sixth Amendment of the United States Constitution. Specifically, petitioner argues that he has been imprisoned without a trial and has not been afforded, generally, those Sixth Amendment rights provided to persons accused of criminal activity.

■■■ Petitioner confuses those Sixth Amendment and other constitutional rights afforded under circumstances other than immigration matters. While it is clear that excludable aliens cannot challenge the admissions process or parole decisions under a claim of constitutional right, *Jean*, 727 F.2d at 972, petitioner is afforded the same constitutional rights as resident aliens or

citizens of the United States under other circumstances. This makes the many procedural protections applicable in other contexts, including where there is a criminal prosecution, "beside the point." *Amanullah v. Nelson*, 811 F.2d 1, 9 (1st Cir.1987).

A related prong claim is whether the petitioner is being subjected to "punishment" in a constitutional sense without the benefits of charge, trial and associated criminal rights. The statutory authority under which an excluded alien is detained does not, of course, refer to that detention as punishment and no design to punish can be discerned from either the INA or the regulations adopted to implement the broad authority given to the Attorney General. *Nor is there any suggestion in the petition or materials in this action that there is a specific intent to punish the petitioner as an individual or to treat him in any fashion separate from detained excludable aliens generally.*

The petitioner's detention is simply incidental to the government's lawful authority to prevent his unauthorized and uncontrolled entry in this Country. While it is significant to the petitioner, the personal loss suffered through confinement does not render confinement "punishment." The petitioner's loss, moreover, having been shown to be temporary because of the annual review of his eligibility for immigration parole, is even less "punishment" than indefinite detention would be. The petitioner's detention is not punishment and thus does not offend or trigger any due process interest.

#### D. Due Process in the Petitioner's Case

 The petition, while long on suggestive principles which can be and have been explored in the context of a detained, excludable alien for whom immediate deportation is not practicable or proper, suggests at heart that the petitioner is detained but should not be. The Court has already determined, in essence, that United States' law permits the detention to which he is subject. The only challenge left to him, therefore, is that the discretion of the Attorney General's designees regarding the decision to detain him is subject to judicial review and that such review in this case warrants relief in the form of release.

 A decision to detain an excludable alien or grant immigration parole is reviewable by a court under a narrow standard. The standard which we find persuasive is that stated in *Garcia–Mir v. Smith*, 766 F.2d 1478, 1485 (11th Cir.1985), *quoting Jean v. Nelson*, 727 F.2d at 977: "a federal court's scope of review in such instances is not the traditional abuse of discretion standard, but rather is limited to ascertaining whether [the attorney general or his designee] has advanced 'a facially legitimate and bona fide reason' for his decision." The authority for adopting this standard was adeptly expressed by the First Circuit Court of Appeals in *Amanullah v. Nelson*, 811 F.2d 1, 9–10 (1st Cir.1987):

> inasmuch as the decisions which we are called upon to consider were discretionary parole decisions made incident to exclusion proceedings, the applicable standard of review is not "abuse of discretion" at all, but is that limited by *Kleindienst v. Mandel*, [408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) ]. In *Kleindienst*, the Supreme Court noted the plenary sweep of Congress's power to make policies and rules for the exclusion of aliens. 408 U.S. at 765–67 [92 S.Ct. at 2583–84]. The Court held that when "the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it...." *Id.* at 770, 92 S.Ct. at 2585.

Other courts of appeal have likewise applied the "facially legitimate and bona fide reason" benchmark when reviewing exercises of the Attorney General's discretion to grant or deny parole. *See Perez–Perez v. Hanberry*, 781 F.2d 1477, 1482 (11th Cir.1986); *Sidney v. Howerton*, 777 F.2d 1490, 1491 (11th Cir.1985); *Jean v. Nelson*, 727 F.2d at 977; *Bertrand v. Sava*, 684 F.2d 204, 212–13 (2nd Cir.1982).

The unchallenged documentation submitted by the respondent shows that the petitioner is excludable on the basis of 8

U.S.C. § 1182(a)(9) and (20), that his parole status was reviewed in accordance with the Cuban Review Plan and that on June 8, 1990 a "final notice of parole denial" was issued denying him immigration parole. That notice recited that the decision was made after a review of his record, a personal interview before a Cuban Review Panel and consideration of any additional information which he submitted to the panel. The notice further recited the reasons which were found to weigh against release of the petitioner on parole:

> You have been convicted of kidnapping, sexual battery, aggravated assault, and assault on a federal as well as correctional officer. While in prison, you have a long list of infractions for various charges such as sexual misconduct, refusing orders, fighting and general inconsistent behavior. It is not clearly evidence that you are likely to remain nonviolent and unlikely to violate the conditions of parole following your release from custody.

The notice also informed the petitioner that his parole status would be reconsidered within one year, pursuant to 8 C.F.R. § 212.12.

The facts that this notice was issued and that there was an interview with the Cuban Review Panel are not disputed by the petitioner. The factual content of the notice is not disputed by him. There is no claim that the procedures of the Cuban Review Plan have not been followed in his case. Finally, the petitioner's serious criminal convictions, his misconduct while in prison and a legitimate concern for whether he would remain nonviolent following release from custody clearly constitute a facially legitimate and bona fide reason for the decision to deny him immigration parole. That is the extent of the inquiry into the specific decision which this Court is permitted to make and the petitioner has shown no error which compels or justifies any other decision.

E. International Law Claim

■ In *Garcia–Mir v. Meese*, 788 F.2d 1446, 1453 (11th Cir.), *cert. denied*, 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986), the Eleventh Circuit Court of Appeals expressly considered the applicability of international law in cases involving the Mariel Cubans and found it to be inapplicable. Quoting *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900), the Court stated: "The public law of nations was long incorporated into the common law of the United States.... But public international law is controlling only 'where there is no treaty and no controlling executive or legislative act or judicial decision ...'." *Garcia–Mir*, 788 F.2d at 1453. After rejecting similar arguments and interpretations of decisions and treatises as those submitted by petitioner in this case, the Eleventh Circuit Court of Appeals concluded that the executive acts of the Attorney General to terminate the status review plan (a precursor to the Cuban Review Plan) and to incarcerate indefinitely pending efforts to deport, constituted a sufficient basis for affirming the trial court's finding that international law does not control. *Garcia–Mir*, 788 F.2d at 1454–55. Furthermore, the Eleventh Circuit noted that in its prior decision in *Jean v. Nelson*, 727 F.2d 957, 974–75 (11th Cir. 1984), *affirmed on other grounds*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1983), it found that the Supreme Court's decision in *Mezei* held that even an indefinitely incarcerated alien "could not challenge his continued detention without a hearing." Thus, the *Garcia–Mir* Court relied on its prior decision as a sufficient controlling judicial basis to meet the test of *The Paquete Habana*, finding international law to be inapplicable to the controversy. *Garcia–Mir*, 788 F.2d at 1455.

In reliance on the Eleventh Circuit's decision in *Garcia–Mir v. Meese, supra*, this Court determines that there are ample controlling executive authorities, legislative directions and judicial decisions regarding the issue of detention in lieu of immigration parole. Those authorities need not again be capsulized to observe that their existence makes resort to international law unnecessary and inappropriate in this instance. The petitioner therefore cannot prevail on the basis of this argument.

## Conclusion

The proliferation of these actions throughout the Nation and the underlying legal, social and political issues which they represent have consumed nearly incalculable effort and resources. It has been held that "the obverse of the grant of discretionary authority in § 1182(d)(5) to parole an excluded alien is a grant of authority to deny parole." *Jean v. Nelson*, 727 F.2d 957, 977 (11th Cir.1984) *(en banc), affirmed on other grounds*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (quoting *Palma v. Verdeyen*, 676 F.2d 100, 104 (4th Cir. 1982)). The petitioner in this action has been denied parole for facially legitimate reasons in a statutory scheme that permits such decisions. The petitioner may also claim the benefit of annual review of his status pursuant to the Cuban Review Plan. His petition is an unexceptional variation of a now-familiar theme, the points of which have been rejected by the courts again and again. No constitutional guarantee or statutory right has been violated through the petitioner's detention. Therefore, the Court now finds that the petitioner has not shown in this action that he is held in custody in violation of the Constitution or laws or treaties of the United States, that his petition for a writ of habeas corpus should accordingly be DENIED and this cause of action DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

## APPENDIX I

Title 8—Aliens and Nationality; Revised as of January 1, 1990

CHAPTER I—IMMIGRATION AND NATURALIZATION SERVICE, DEPARTMENT OF JUSTICE SUBCHAPTER B—IMMIGRATION REGULATIONS PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

§ 212.12 Parole determinations and revocations respecting Mariel Cubans.

(a) Scope. This section applies to any native of Cuba who last came to the United States between April 15, 1980, and October 20, 1980 (hereinafter referred to as "Mariel Cuban") and who is being detained by the Immigration and Naturalization Service (hereinafter referred to as the "Service") pending his or her exclusion hearing, or pending his or her return to Cuba or to another country. It covers Mariel Cubans who have never been paroled as well as those Mariel Cubans whose previous parole has been revoked by the Service. It also applies to any Mariel Cuban, detained under the authority of the Immigration and Nationality Act in any facility, who has not been approved for release or who is currently awaiting movement to a Service or Bureau Of Prisons (BOP) facility. In addition, it covers the revocation of parole for those Mariel Cubans who have been released on parole at any time.

(b) Parole authority and decision. Except as provided in § 212.13, the authority to grant parole under section 212(d)(5) of the Act to a detained Mariel Cuban shall be exercised by the Commissioner, acting through the Associate Commissioner for Enforcement, as follows:

(1) Parole decisions. The Associate Commissioner for Enforcement may, in the exercise of discretion, grant parole to a detained Mariel Cuban for emergent reasons or for reasons deemed strictly in the public interest. A decision to retain in custody shall briefly set forth the reasons for the continued detention. A decision to release on parole may contain such special conditions as are considered appropriate. A copy of any decision to parole or to detain, with an attached copy translated into Spanish, shall be provided to the detainee. Parole documentation for Mariel Cubans shall be issued by the district director having jurisdiction over the alien, in accordance with the parole determination made by the Associate Commissioner for Enforcement.

(2) Additional delegation of authority. All references to the Commissioner and Associate Commissioner for Enforcement in this section shall be deemed to include any person or persons (including a committee) designated in writing by the Commis-

sioner or Associate Commissioner for Enforcement to exercise powers under this section.

(c) Review Plan Director. The Associate Commissioner for Enforcement shall appoint a Director of the Cuban Review Plan. The Director shall have authority to establish and maintain appropriate files respecting each Mariel Cuban to be reviewed for possible parole, to determine the order in which the cases shall be reviewed, and to coordinate activities associated with these reviews.

(d) Recommendations to the Associate Commissioner for Enforcement. Parole recommendations for detained Mariel Cubans shall be developed in accordance with the following procedures.

(1) Review Panels. The Director shall designate a panel or panels to make parole recommendations to the Associate Commissioner for Enforcement. A Cuban Review Panel shall, except as otherwise provided consist of two persons. Members of a Review Panel shall be selected from the professional staff of the Service. All recommendations by a two-member Panel shall be unanimous. If the vote of a two-member Panel is split, it shall adjourn its deliberations concerning that particular detainee until a third Panel member is added. A recommendation by a three-member Panel shall be by majority vote. The third member of any Panel shall be the Director of the Cuban Review Plan or his designee.

(2) Criteria for Review. Before making any recommendation that a detainee be granted parole, a majority of the Cuban Review Panel members, or the Director in case of a record review, must conclude that:

(i) The detainee is presently a nonviolent person;

(ii) The detainee is likely to remain nonviolent;

(iii) The detainee is not likely to pose a threat to the community following his release; and

(iv) The detainee is not likely to violate the conditions of his parole.

(3) Factors for consideration. The following factors should be weighed in considering whether to recommend further detention or release on parole of a detainee:

(i) The nature and number of disciplinary infractions or incident reports received while in custody;

(ii) The detainee's past history of criminal behavior;

(iii) Any psychiatric and psychological reports pertaining to the detainee's mental health;

(iv) Institutional progress relating to participation in work, educational and vocational programs;

(v) His ties to the United States, such as the number of close relatives residing lawfully here;

(vi) The likelihood that he may abscond, such as from any sponsorship program; and

(vii) Any other information which is probative of whether the detainee is likely to adjust to life in a community, is likely to engage in future acts of violence, is likely to engage in future criminal activity, or is likely to violate the conditions of his parole.

(4) Procedure for review. The following procedures will govern the review process:

(i) Record review. Initially, the Director or a Panel shall review the detainee's file. Upon completion of this record review, the Director or the Panel shall issue a written recommendation that the detainee be released on parole or scheduled for a personal interview.

(ii) Personal interview. If a recommendation to grant parole after only a record review is not accepted or if the detainee is not recommended for release, a Panel shall personally interview the detainee. The scheduling of such interviews shall be at the discretion of the Director. The detainee may be accompanied during the interview by a person of his choice, who is able to attend at the time of the scheduled interview, to assist in answering any questions. The detainee may submit to the Panel any information, either orally or in writing,

which he believes presents a basis for release on parole.

(iii) Panel recommendation. Following completion of the interview and its deliberations, the Panel shall issue a written recommendation that the detainee be released on parole or remain in custody pending deportation or pending further observation and subsequent review. This written recommendation shall include a brief statement of the factors which the Panel deems material to its recommendation. The recommendation and appropriate file material shall be forwarded to the Associate Commissioner for Enforcement, to be considered in the exercise of discretion pursuant to § 212.12(b).

(e) Withdrawal of parole approval. If a detainee approved for parole fails to maintain proper behavior while he is awaiting suitable sponsorship or placement, his parole approval may be revoked by the Associate Commissioner for Enforcement.

(f) Sponsorship. No detainee may be released on parole until suitable sponsorship or placement has been found for the detainee. The paroled detainee must abide by the parole conditions specified by the Service in relation to his sponsorship or placement. The following sponsorships and placements are suitable:

(1) Placement by the Public Health Service in an approved halfway house or mental health project;

(2) Placement by the Community Relations Service in an approved half-way house or community project; and

(3) Placement with a close relative such as a parent, spouse, child, or sibling who is a lawful permanent resident or a citizen of the United States.

(g) Timing of reviews. The timing of review shall be in accordance with the following guidelines.

(1) Parole revocation cases. The Director shall schedule the review process in the case of a new or returning detainee whose previous immigration parole has been revoked. The review process will commence with a scheduling of a file review, which will ordinarily be expected to occur within approximately three months after parole is revoked.

(2) Continued detention cases. A subsequent review shall be commenced for any detainee within one year of a refusal to grant parole under either § 212.12(b) or § 212.13, whichever is later, unless a shorter interval is specified by the Director.

(3) Discretionary reviews. The Cuban Review Plan Director, in his discretion, may schedule a review of a detainee at any time when the Director deems such a review to be warranted.

(h) Revocation of parole. The Associate Commissioner for Enforcement shall have authority, in the exercise of discretion, to revoke parole in respect to Mariel Cubans. A district director may also revoke parole when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Associate Commissioner. Parole may be revoked in the exercise of discretion when, in the opinion of the revoking official:

(1) The purposes of parole have been served;

(2) The Mariel Cuban violates any condition of parole;

(3) It is appropriate to enforce an order of exclusion or to commence proceedings against a Mariel Cuban; or

(4) The period of parole has expired without being renewed.

§ 212.13 Departmental parole determinations respecting certain Mariel Cubans.

(a) Scope. This section, establishing a Departmental Release Review Program, applies to all excludable Mariel Cubans who on the effective date of this regulation are detained by virtue of the Attorney General's authority under the Immigration and Nationality Act and whose parole has been denied after the exhaustion of the procedures set forth in § 212.12. This Departmental Release Review Program shall be under the general supervision of the Associate Attorney General, who shall administer the Program and establish such additional procedures as may be required.

(b) Single review. Each detainee described in paragraph (a) above shall be entitled to only one review before a Departmental Panel. Should a detainee denied parole under this section subsequently receive further review pursuant to § 212.12 or any successor parole review plan of the Service, such detainee shall not be entitled to a second review before a Departmental Panel.

(c) Departmental panels. The Associate Attorney General shall establish panels which will be comprised of three persons from within the Department of Justice, one of whom must be an attorney, and one of whom must be a representative of the Community Relations Service. The Immigration and Naturalization Service shall not be represented on the panels. These panels shall consider the cases of those Mariel Cubans whose parole has previously been denied pursuant to the provisions set forth in § 212.12.

(d) Parole authority. Each Departmental Panel shall be vested with the full discretion of the Attorney General under section 212(d)(5) of the Act to grant parole for emergent reasons or for reasons deemed strictly in the public interest.

(e) Notification and submission. Prior to the submission by the Service of a case to a Departmental Panel, the detainee shall receive notification from the Service that he is about to receive Departmental Panel consideration. Such notification shall inform the detainee that he may submit a written statement to a Departmental Panel, within 30 days from the date of service of the notification, setting forth any factors he deems relevant to the parole consideration and he may, at no expense to the government, have his representative or counsel assist in the preparation of this written statement.

(f) Interviews. A Departmental Panel may designate one of its members to interview the detainee and report in writing to the full Panel whenever in its sole discretion it deems such action appropriate.

(g) Panel decisions. The written decision of a Departmental Panel will be based on a review of the record created during the review by the Service pursuant to § 212.12, the written submission, if any, from the detainee, and the information obtained from any Panel interview of the detainee. Except as provided in paragraph (i) of this section, all written decisions of a Departmental Panel will be final and subject to no further review.

(h) Sponsorship. No detainee may be released on parole until suitable sponsorship or placement has been found for the detainee. The paroled detainee must abide by the parole conditions specified by the Service in relation to his sponsorship or placement. The following sponsorships and placements are suitable:

(1) Placement by the Public Health Service in an approved halfway house or mental health project;

(2) Placement by the Community Relations Service in an approved halfway house or community project; and

(3) Placement with a close relative such as a parent, spouse, child, or sibling who is a lawful permanent resident or a citizen of the United States.

(i) Withdrawal of parole approval. A Departmental Panel may, in its discretion, withdraw its approval for parole of any detainee prior to release when, in its opinion, the conduct of the detainee, or any other circumstance, indicates that parole would no longer be appropriate.

(j) Parole revocations. Parole granted under this section may be revoked pursuant to § 212.12.