Luis **ALVAREZ–MENDEZ,**
**Petitioner–Appellant,**

v.

**Fred J. STOCK, Warden, Respondent–
Appellee.**

**No. 90–55447.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 6, 1991.

Decided Aug. 12, 1991.

Francis D. Logan Jr. (law student), and Charles D. Weisselberg, Dennis E. Curtis, Post–Conviction Justice Project, University of Southern California Law Center, Los Angeles, Cal., for petitioner-appellant.

Lauri Steven Filppu, Office of Immigration Litigation, Washington, D.C., and Michael C. Johnson, Asst. U.S. Atty., Los Angeles, Cal., for respondent-appellee.

Before HUG, BEEZER and HALL, Circuit Judges.

BEEZER, Circuit Judge:

Luis Alvarez–Mendez is an excluded alien who has been held in detention since 1988 because Cuba, his nation of citizenship, will not accept his repatriation. He filed a petition for habeas corpus, claiming his continued detention lacks statutory authority and violates the Constitution of the United States and rules of international law. The district court denied his petition. We affirm.

## I

Alvarez–Mendez arrived in the United States on May 20, 1980. He was one of over 100,000 Cuban refugees, known as "Mariel Cubans," who came to Florida by boat from the port of Mariel, Cuba. Shortly after his arrival in the United States, Alvarez–Mendez was granted immigration parole, pursuant to 8 U.S.C. § 1182(d)(5)(A) (1988).

On July 13, 1984, Alvarez–Mendez was arrested in Florida for burglary and murder. On January 25, 1985, he pleaded guilty to second degree murder, armed burglary with assault with a deadly weapon (a rock), and armed robbery with a deadly weapon. He was sentenced to three concurrent twelve-year prison terms. On August 10, 1988, Alvarez–Mendez was released from custody in Florida.

Upon release, Alvarez–Mendez was taken into custody by the Immigration and Naturalization Service (INS), which had revoked his immigration parole without a hearing, see 8 C.F.R. § 212.12(h) (1990), because of his murder conviction. On October 6, 1988, after a hearing, an immigration judge ordered Alvarez–Mendez excluded and deported from the United States. The Board of Immigration Appeals summarily dismissed his appeal on February 23, 1989.

Since being taken into INS custody, Alvarez–Mendez has been considered three times for reparole pursuant to regulations promulgated to administer the parole of Mariel Cubans. See 8 C.F.R. § 212.12 (1990). Under these regulations, called the Cuban Review Plan, Mariel Cubans held in custody are given annual reviews to determine their eligibility for parole.

On November 1, 1988, Alvarez–Mendez was interviewed by a Cuban Review Plan panel which found that in addition to the murder, burglary and assault convictions, Alvarez–Mendez was arrested several times prior to his conviction on suspicion of forgery, grand theft and petty larceny. The panel also found that during his incarceration in Florida, Alvarez–Mendez was reported to be involved in a fight, and that he had admitted to being arrested numerous times in Cuba for disrespect for the police. On the basis of these findings the panel recommended that he remain in custody. The panel was "unable to conclude that [Alvarez–Mendez was] a nonviolent person or [was] likely to remain nonviolent or [was] not likely to commit further crimes if released." The INS Associate Commissioner, who is given the authority to "grant parole to a detained Mariel Cuban for emergent reasons or for reasons deemed strictly in the public interest," 8 C.F.R. § 212.12(b), agreed with the INS panel's recommendation.

Alvarez–Mendez's second review occurred on January 10, 1990. The Review Plan panel recommended that Alvarez–Mendez be paroled, finding that he appeared to be rehabilitated, non-violent and likely to remain non-violent. The Associate Commissioner reviewed Alvarez–Mendez's record, including the record of the panel's interview, and disagreed with the panel's conclusions. The Associate Commissioner cited Alvarez–Mendez's convictions and arrests as the basis for his inability to conclude that Alvarez–Mendez would remain non-violent and honor the conditions of parole if released.

During the week of April 8, 1991, Alvarez–Mendez was interviewed by a Cuban Review Panel for the third time. The panel's recommendation has been forwarded to the Associate Commissioner for a final determination.

Alvarez–Mendez filed a petition for a writ of habeas corpus in the district court, challenging the Attorney General's authority to continue Alvarez–Mendez's detention. The district court denied the petition in a published order. See *Alvarez–Mendez v. Stock*, 746 F.Supp. 1006 (C.D.Cal.1990). Alvarez–Mendez appeals the denial of the writ.

## II

We review a district court's judgment dismissing a habeas corpus petition *de novo*. *Jessup v. United States Parole Commission*, 889 F.2d 831, 834 (9th Cir. 1989).

■ The government argues that section 504(b) of the Immigration Act of 1990 explicitly authorizes the Attorney General to detain aliens who have been convicted of aggravated felonies and who are subject to final orders of exclusion. Section 504(b) amended 8 U.S.C. § 1226, entitled "Exclusion of aliens," to add the following language:

(e)(1) Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon completion of the alien's sentence for such conviction.

(2) Notwithstanding any other provision of this section, the Attorney General shall not release such felon from custody unless the Attorney General determines that the alien may not be deported because [a country "upon request denies or unduly delays acceptance of the return of any alien who is a ... citizen ... thereof." 8 U.S.C. § 1253(g) ].

(3) If the determination described in paragraph (2) has been made, the Attorney General may release such alien only after—

(A) a procedure for review of each request for relief under this subsection has been established,

(B) such procedure includes consideration of the severity of the felony committed by the alien, and

(C) the review concludes that the alien will not pose a danger to the safety of other persons or to property.

Immigration Act of 1990 (1990 Act), Pub.L. No. 101–649, § 504(b), 104 Stat. 4978, 5050 (codified at 8 U.S.C. § 1226(e)). Alvarez–Mendez argues that the provision does not apply to him because it is not given retroactive effect and because it does not apply to aliens already determined to be excludable.

"Absent clear legislative intent, commonly expressed through a retroactivity clause, a statute is not given retroactive effect." *United States v. Rewald*, 835 F.2d 215, 216

(9th Cir.1987). Section 504(c) of the 1990 Act states that the amendments made by section 504 "shall take effect on the date of the enactment of this Act." Immigration Act of 1990, § 504(c). We are satisfied that Congress did not intend the amendment to be retroactive.[1]

■ Although the new section 1226(e) does not retroactively authorize any of the Attorney General's acts accomplished prior to the amendment, we are concerned here only with the legality of Alvarez–Mendez's present detention. Because this case involves a petition for the writ of habeas corpus, and not a claim for damages for illegal detention, the only issue before us is whether Alvarez–Mendez's detention is illegal today. Therefore, even if his detention was illegal prior to the 1990 Act, if that Act gives the Attorney General the authority to hold Alvarez–Mendez today, his present custody is not illegal and habeas corpus is not available. *See Picrin-Peron v. Rison*, 930 F.2d 773, 775 (9th Cir.1990) (the historical function of the writ is "to secure release from illegal physical custody.") (citing *Preiser v. Rodriquez*, 411 U.S. 475, 484–85, 93 S.Ct. 1827, 1833–34, 36 L.Ed.2d 439 (1973)).

■ Alvarez–Mendez contends that the new section 1226(e) deals only with proceedings to determine excludability and does not create any authority to detain aliens already subject to final orders of exclusion. Section 1226 is entitled "Exclusion of aliens—Proceedings," *see* 8 U.S.C. § 1226, and the new subsection states that the Attorney General shall take certain aliens into custody *"[p]ending a determination of excludability." Id.* § 1226(e)(1) (emphasis added). According to Alvarez–Mendez, once a final order of exclusion has been entered against an alien, section 1226 no longer applies and section 1227 requires the Attorney General to release the alien if he cannot immediately be removed from the United States.[2]

---

1. This is supported by Congress' clear use of a retroactivity clause in section 505. *See* Immigration Act of 1990, § 505(b) (Section 505 "shall take effect on the date of the enactment of this

Act and shall apply to convictions entered before, on, or after such date.").

2. Section 1227 is entitled "Immediate deportation of aliens excluded from admission or enter-

Despite the heading under which it is placed, section 1226(e) does provide for continued detention. Subsection (e)(2) states that, *"[n]otwithstanding any other provision of this section,* the Attorney General *shall not* release" aliens detained because of prior convictions of aggravated felonies without making certain other findings. *Id.* § 1226(e)(2) (emphasis added). When read in the context of the whole 1990 Act, it is clear that this language is part of a scheme requiring the Attorney General to detain all aliens convicted of aggravated felonies whose release would pose a threat to society.[3]

■ In addition to changing the exclusion procedures, the 1990 Act amended the procedures for deportation.[4] Section 504(a) of the 1990 Act made clear that notwithstanding certain limitations on the Attorney General's authority to detain aliens against whom a final order of deportation has been entered, *see id.* § 1252(a)(2)(A), (c), the Attorney General "shall not re-

lease" an alien convicted of an aggravated felony unless "the Attorney General determines that the alien is not a threat to the community." *See id.* § 1252(a)(2).

The interpretation of section 1226(e) proposed by Alvarez–Mendez would create an irrational distinction. When a dangerous alien is subject to deportation proceedings, the Attorney General must detain him both during the pendency of the proceedings and after a final order of deportation has been entered until the alien can be removed from the country. *See id.* § 1252(a)(2). In the case of a dangerous alien subject to exclusion proceedings, however, Alvarez–Mendez interprets sections 1226 and 1227 to require the Attorney General to detain the alien while exclusion proceedings are pending, but to release him once a final order of exclusion is entered, unless the Attorney General can effect the alien's removal immediately. Not only would this distinction undermine Congress' attempt to

---

ing in violation of law." Subsection (a) provides:

> (1) Any alien ... arriving in the United States who is excluded under this chapter, shall be immediately deported, in accommodations of the same class in which he arrived, unless the Attorney General, in an individual case, in his discretion, concludes that immediate deportation is not practicable or proper. [In most cases, d]eportation shall be to the country in which the alien boarded the vessel or aircraft on which he arrived in the United States.... The cost of maintenance including detention expenses and expenses incident to detention of any such alien while he is being detained shall [in most cases] be borne by the owner or owners of the vessel or aircraft on which he arrived.

8 U.S.C. § 1227(a)(1). Subsection (2) explains where the Attorney General may send an excluded alien if the country designated in paragraph (1) will not accept him. *Id.* § 1227(a)(2).

Alvarez–Mendez argues that because most of subsection (a)(1) deals with the responsibilities of the owner of the vessel or aircraft on which the alien arrived in the United States, the Attorney General may determine that "immediate deportation is not practicable or proper" only when the alien cannot be deported "in accommodations of the same class in which he arrived." Because the problem of a country refusing to accept an alien's return is addressed in a separate paragraph, Alvarez–Mendez argues that such a problem cannot be a basis for deter-

mining that immediate deportation is not "practicable or proper."

Because we find Alvarez–Mendez's detention explicitly authorized by section 1226(e), we cannot agree with his interpretation of section 1227.

3. That Congress intended to create such a scheme and to include detention of aliens subject to final exclusion orders is supported by the statements of Senator Graham. Senator Graham said that the criminal alien amendments would "[a]pply aggravated felony procedures to 'excludable' aliens," *i.e.*, those who have already been determined excludable, *see* 8 U.S.C. § 1182(a) (describing classes of "excludable aliens" as those who "shall be excluded"), because "the Federal Government must make sure that dangerous aliens are not on the streets, not allowed to commit new crimes, and not caught in a lengthy deportation process." 149 Cong. Rec. S17117–18 (daily ed. Oct. 26, 1990) (Part II).

4. "Deportation" refers to the removal from the country of aliens who are physically present in the United States. *See* 8 U.S.C. § 1251 (1988). "Exclusion" refers to the act of keeping undesirable aliens from entering the United States. *See id.* § 1182. However, an excludable alien may be paroled into the United States, in which case the law treats him as if he never entered the country and "exclusion" remains the procedure for removing him. *See id.* § 1182(d)(5)(A). *See generally Leng May Ma v. Barber*, 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958).

protect society from dangerous aliens, it would be contrary to accepted tenets of U.S. immigration law, which treat aliens subject to deportation more favorably than those seeking initial admission.[5]

The only logical interpretation of section 1226(e) is that it both requires the Attorney General to detain aliens convicted of aggravated felonies pending a determination of their excludability, and provides that where deportation of an alien found excludable cannot be immediate, the Attorney General may release him only if doing so will not endanger society. Because the procedures under which Alvarez–Mendez's continued detention has been reviewed satisfy the requirements of section 1226(e)(3), including consideration of the severity of the felony he committed and a conclusion that he may "pose a danger to the safety of other persons or to property," *see* 8 U.S.C. § 1226(e)(3); *see also* 8 C.F.R. § 212.12(d)(2) (1991), the Attorney General has explicit statutory authority to continue Alvarez–Mendez's detention.

### III

Alvarez–Mendez has been in a medium security federal prison since August 1988. He argues that his detention constitutes punishment, and as such violates the Fifth and Sixth amendments.[6]

A detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. *White v. Roper*, 901 F.2d 1501, 1504 (9th Cir.1990). Not all detention, however, is punishment. *Bell v. Wolfish*, 441 U.S. 520, 539 n. 20, 99 S.Ct. 1861, 1874 n. 20, 60 L.Ed.2d 447 (1979). In the absence of express intent to punish, the most significant factors in identifying punishment are "whether an alternative purpose to which [the restriction]

may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *United States v. Salerno*, 481 U.S. 739, 747, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) (quotations omitted).

In denying Alvarez–Mendez parole, the Associate Commissioner cited Alvarez–Mendez's criminal arrests and convictions, and concluded on the basis of these crimes that it was unlikely that Alvarez–Mendez would "remain non-violent or honor the conditions of parole if released." Protecting society from a potentially dangerous alien is a rational, non-punitive purpose for Alvarez–Mendez's detention. Because such protection requires separating Alvarez–Mendez from society, and because immediate removal from the country is not possible, detention is not an excessive means of accomplishing such protection.

Alvarez–Mendez argues that the Attorney General's only power to protect society is his power to deport dangerous aliens. However, the Attorney General is explicitly granted the power to exclude dangerous aliens, *see* 8 U.S.C. § 1182(a)(2) (aliens excludable on criminal and related grounds), and the Immigration Act of 1990 demonstrates that the Attorney General's power to detain certain aliens pending deportation or exclusion is intended, at least in part, to be a means of protecting society. *See* 1990 Act, §§ 504(a), (b) (codified at 8 U.S.C. §§ 1226(e), 1252(a)). Alvarez–Mendez's detention does not constitute illegal punishment.

### IV

Alvarez–Mendez argues that by revoking his parole without a hearing, the INS violated his right to due process. 8

---

**5.** Excludable and deportable aliens have long been treated differently. In *Landon v. Plasencia*, 459 U.S. 21, 32–33, 103 S.Ct. 321, 329–30, 74 L.Ed.2d 21 (1982), the Supreme Court explained that

> an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.... [H]owever, once

an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly.

**6.** These amendments apply to aliens as well as to citizens. *See Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896).

U.S.C. § 1182(d)(5)(A) (1988) provides that the Attorney General may

> in his discretion parole into the United States ... any alien applying for admission to the United States, *but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall,* in the opinion of the Attorney General, *have been served* the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.*

(emphasis added). Under this statute, an alien who has been paroled into the United States is treated the same as one who has only just arrived. *See Leng May Ma v. Barber,* 357 U.S. 185, 188–90, 78 S.Ct. 1072, 1074–75, 2 L.Ed.2d 1246 (1958).

We applied this principle to a case almost identical to Alvarez–Mendez's in *Siu Fung Luk v. Rosenberg,* 409 F.2d 555 (9th Cir.), *cert. dismissed,* 396 U.S. 801, 89 S.Ct. 2151, 24 L.Ed.2d 38 (1969). In *Siu Fung Luk,* an alien was paroled into the United States in April 1965. In August, he was notified that his parole had been revoked. In April 1967, he was notified that arrangements for his deportation had been made and that he was to report for deportation on May 1. The alien argued that his deportation order could not be enforced because he was not given a hearing before his parole was revoked. Citing 8 U.S.C. § 1182(d)(5) and *Leng May Ma,* this court held that the alien had no right to a hearing before his parole was revoked. *Id.* at 558.

■ Alvarez–Mendez also challenges the procedures for evaluating his eligibility for reparole under the Cuban Review Plan. Parole decisions are an integral part of the admissions process and excludable aliens cannot challenge such decisions as a matter of constitutional right. *Fernandez–Roque v. Smith,* 734 F.2d 576, 582 (11th Cir.1984); *Jean v. Nelson,* 727 F.2d 957, 966, 972 (11th Cir.1984), *aff'd,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985). Because Alvarez–Mendez's detention is not punitive, *see supra,* we may do no more

than review the Associate Commissioner's decision for abuse of discretion. The decision not to reparole Alvarez–Mendez was based on the fact that he committed serious crimes against people and property when he was previously released. This is a reasonable decision based on relevant considerations.

## V

Alvarez–Mendez's final argument is that his continued detention violates international legal prohibitions against prolonged arbitrary detention.

■ Although "[i]nternational law is a part of the law of the United States," *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900), we are bound by a properly enacted statute, provided it be constitutional, even if that statute violates international law. *See United States v. Aguilar,* 883 F.2d 662, 679 (9th Cir.1989) ("In enacting statutes, Congress is not bound by international law; if it chooses to do so, it may legislate contrary to the limits posed by international law."), *cert. denied,* —— U.S. ——, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991).

■ Under the Immigration and Naturalization Act, as amended by the 1990 Act, the Attorney General may not release Alvarez–Mendez unless he determines that Alvarez–Mendez "will not pose a danger to the safety of other persons or to property." 8 U.S.C. § 1226(e)(3). The Attorney General, through the Associate Commissioner, has been unable to reach such a conclusion. We have no power to invoke international law to require the release of an alien whom a statute expressly requires the Attorney General to detain.

## VI

The denial of the petition for a writ of habeas corpus is AFFIRMED.