**Mario HERNANDEZ NODARSE, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. CIV. A. H–00–2307.**

United States District Court, S.D. Texas, Houston Division.

Sept. 5, 2001.

---

Mario Hernandez Nodarse, Federal Correctional Institution, Bastrop, TX, Pro se.

Howard E Rose, Special Assistant U.S. Atty, Houston, TX, for United States of America, respondents.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

### I. *Introduction*

Petitioner Mario Hernandez–Nodarse ("Hernandez") challenges his continued de-

tention by Respondent United States of America ("United States"). Having reviewed the pending motion, the submissions of the parties, the administrative record, the pleadings, and the applicable law, the court is of the opinion that the United States' Motion for Summary Judgment (# 10) should be granted and that Hernandez's Petition for Writ of Habeas Corpus (# 1) should be denied.

## II. *Background*

Hernandez is a native and citizen of Cuba. On May 14, 1980, he entered the United States as part of the Mariel "Freedom Flotilla" Boatlift, when approximately 125,000 Cubans came by small boats from the port of Mariel, Cuba, to the United States. *See Gisbert v. U.S. Attorney Gen.,* 988 F.2d 1437, 1439 (5th Cir.), *amended on other grounds,* 997 F.2d 1122 (5th Cir. 1993); *Alvarez–Mendez v. Stock,* 941 F.2d 956, 959 (9th Cir.1991), *cert. denied,* 506 U.S. 842, 113 S.Ct. 127, 121 L.Ed.2d 82 (1992); *Fernandez–Roque v. Smith,* 734 F.2d 576, 578 (11th Cir.1984); *Palma v. Verdeyen,* 676 F.2d 100, 101 (4th Cir.1982). Many of these so-called Mariel Cubans, including Hernandez, admitted to having participated in criminal activity in Cuba and were thus detained pending exclusion proceedings. *See Fernandez–Roque,* 734 F.2d at 578; *Palma,* 676 F.2d at 101. Cuba, however, initially refused to accept the return of excluded Mariel Cubans and, eventually, almost all of them were released on immigration parole pursuant to a variety of parole review and sponsorship programs established for Cubans who could not be promptly returned home. *See Fernandez–Roque,* 734 F.2d at 579; *Palma,* 676 F.2d at 101–02.

In 1984, the United States and Cuba reached an agreement which called for the return of 2,746 Cubans identified as having serious criminal backgrounds or mental infirmities, and parole releases were halted. *See Gisbert,* 988 F.2d at 1440 n. 4; *Garcia–Mir v. Smith,* 766 F.2d 1478, 1481 (11th Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986). In May 1985, however, after the United States returned 201 of these Cubans, Cuba suspended the agreement, agreeing to resume implementation of the 1984 agreement in November 1987. *See Gisbert,* 1440 n. 4. Since that time, approximately 450 excludable aliens have been returned to Cuba. *See id.* The United States government has consistently maintained its position that Cuba must accept the return of all its nationals who are denied admission to the United States. *See id.*

In the meantime, federal regulations have been promulgated setting forth the procedures to be followed in determining whether Mariel Cubans may be released on immigration parole. *See* 8 C.F.R. §§ 212.12, 212.13; *Gisbert,* 988 F.2d at 1443–44; *Alvarez–Mendez,* 941 F.2d at 959. Pursuant to these regulations, known as the Cuban Review Plan, Mariel Cubans in the custody of the Immigration and Naturalization Service ("INS") are reviewed annually by a Cuban Review Panel to determine their suitability for immigration parole, including a review of the aliens' records and a personal interview. *See* 8 C.F.R. § 212.12(d)(4); *Gisbert,* 988 F.2d at 1443–44 & n. 11; *Alvarez–Mendez,* 941 F.2d at 959. During the interview, the aliens are entitled to the assistance of a representative and may present oral and written information in support of their arguments for release. *See* 8 C.F.R. § 212.12(d)(4)(ii). The Cuban Review Panel considers such factors as the aliens' institutional progress, their ties to the community, their criminal and disciplinary records, psychological evaluations, as well as the likelihood that they might abscond from a sponsorship program, and issues recommendations regarding parole. *See* 8

U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.12(b) & (d); *Gisbert,* 988 F.2d at 1444 n. 11; *Alvarez–Mendez,* 941 F.2d at 959. The INS Associate Commissioner is given the authority to "grant parole to a detained Mariel Cuban for emergent reasons or for reasons deemed strictly in the public interest." 8 C.F.R. § 212.12(b)(1); *see Alvarez–Mendez,* 941 F.2d at 959. If approved for parole, the alien's release is conditioned on his placement with a suitable sponsor. *See* 8 C.F.R. § 212.12(f); *Fernandez–Roque,* 734 F.2d at 579, 582–84.

After Hernandez's initial detention at the Fort Chaffee Refugee Encampment near Fort Chaffee, Arkansas, the decision was made to release him on immigration parole under the sponsorship of his brother, who resided in Miami, Florida. On April 12, 1981, Hernandez was arrested for burglary of a motor vehicle in Hialeah, Florida. The charges were apparently dropped on July 31, 1981, although a United States Public Health Service mental health evaluation of Hernandez states that he received an eight-month sentence for that offense. On February 16, 1982, Hernandez was arrested for burglary of a conveyance, grand theft, possession of burglary tools, and loitering or prowling. He pleaded guilty to these charges and was assessed a nine-month sentence followed by eighteen months' probation. On March 26, 1982, while on probation, he was charged with loitering and prowling, for which he was convicted and sentenced to time served.

On September 30, 1982, Hernandez was arrested in Hialeah for resisting arrest and aggravated assault of a police officer. The charges were reduced to resisting arrest without violence and, on November 15, 1982, he was convicted and sentenced to nine months' confinement followed by eighteen months' probation, to run concur-rently with his prior sentence. On October 17, 1984, Hernandez was arrested in Miami, Florida, for burglary, grand theft, and resisting arrest. Upon conviction in February 1985, he was sentenced to concurrent 364–day terms for the first two offenses and a four-month term for the third offense, with credit for time served. On December 15, 1985, Hernandez was arrested in Miami for possession of a firearm by a convicted felon and carrying a concealed firearm. He was subsequently convicted of those offenses and was sentenced on March 10, 1986, to serve one year in community control. His probation was revoked on July 18, 1986, and he was sentenced to two-and-one-half years' imprisonment for each count, with the sentences to run concurrently.

On May 30, 1987, Florida authorities released Hernandez to the INS, which detained him and placed him in exclusion proceedings. On November 1, 1988, an immigration judge found him excludable and ordered him excluded and returned to Cuba. There is no indication that Hernandez appealed this decision to the Board of Immigration Appeals. Pending his return to Cuba, Hernandez went before six Cuban Review Panels until, on January 17, 1992, he was placed on conditional release in a halfway house in Chicago, Illinois. After three months, he disappeared, reappearing in Dade County, Florida, on January 10, 1993, when he was arrested for attempted burglary and possession of burglary tools. After a trial, he was convicted and, on April 30, 1993, was ordered to serve concurrent seven-year terms of imprisonment for each offense. After serving one year of his sentence, he was placed on probation and turned over to the INS, which released him on immigration parole under family sponsorship.

On March 15, 1994, Hernandez was arrested in Hialeah and charged with burgla-

ry, grand theft, possession of burglary tools, and carrying a concealed weapon. His state probation was revoked and, on May 20, 1994, he was sentenced to three concurrent twenty-one month sentences of imprisonment for the first three offenses, to be served concurrently with his April 1993 sentences. The entry of sentence was suspended as to the fourth offense. After his release on January 3, 1997, Hernandez was remanded to INS custody.

On March 12, 1998, Hernandez was interviewed by a Cuban Review Panel. On April 10, 1998, the INS Associate Commissioner, citing 8 C.F.R. § 212.12, informed him in a Final Notice of Parole Denial that he would not be released on immigration parole, referencing his criminal record and his "propensity to engage in recidivist criminal behavior." The Commissioner also noted that, since his detention in January 1997, Hernandez had been "cited for insubordination, having a homemade shank [knife] in [his] locker and disrespect to an officer." The Commissioner concluded, "As such, it is NOT clearly evident that [he is] unlikely to pose a threat to the community and/or unlikely to violate the conditions of parole were a more favorable decision to have been rendered on [his] behalf." Hernandez's parole status was subsequently reviewed by a Cuban Review Panel on at least two more occasions. Following such reviews, the Commissioner found on April 7, 1999, and again on May 26, 2000, that Hernandez's release was not in the public interest in view of his criminal record, further disciplinary problems, and the fact that his responses to questions presented by the Cuban Review Panel were "found to be non-credible." In each of the parole denial notices, Hernandez was informed:

> Pursuant to 8 CFR 212.12, the Immigration and Naturalization Service will reconsider your parole status within one year of the date of this notice. It is in your best interest to maintain proper behavior while awaiting that review.

On July 3, 2000, Hernandez filed his Petition for Writ of Habeas Corpus, contending that he is being detained illegally by the INS because he has served his criminal sentences. Conceding that he arrived in the United States in May 1980 as part of the Mariel Boatlift, Hernandez nevertheless maintains that he is a legal permanent resident alien and cites only one criminal conviction, purportedly rendered by the 11th Circuit District Court of Dade County, Florida, in March 1992, for which he claims to have been sentenced to three years eight months' imprisonment for the theft of an automobile. He offers no evidence in support of his assertions. In his response to the United States' answer, Hernandez acknowledges many of his other convictions and sentences, but he notes that many of the convictions are old and characterizes his criminal record as "small." On December 5, 2000, the United States filed a motion for summary judgment, asserting that, under Fifth Circuit precedent, there is no time limit on the detention of aliens who are denied entry into the United States and that, due to Hernandez's criminal propensities, the Attorney General has a facially legitimate and bona fide reason for detaining him.

### III. *Analysis*

"United States immigration laws create two types of proceedings in which aliens may be denied the hospitality of this country: deportation hearings and exclusion hearings." *Gisbert*, 988 F.2d at 1440 (citing *Landon v. Plasencia*, 459 U.S. 21, 24–25, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982)). "Deportation hearings are the usual means by which aliens who have effected actual entry into this country are removed; exclusion hearings, on the other hand, are the means of proceeding against aliens

who are seeking initial admission into the United States." *Id.* (citing *Landon*, 459 U.S. at 24–25, 103 S.Ct. 321). "Although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Gisbert*, 988 F.2d at 1440 (citing *Garcia–Mir*, 766 F.2d at 1484; *Jean v. Nelson*, 727 F.2d 957, 969 (11th Cir.1984), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985)); *see Zadvydas v. Davis*, —— U.S. ——, 121 S.Ct. 2491, 2500, 150 L.Ed.2d 653 (2001); *United States v. Lopez–Vasquez*, 227 F.3d 476, 484–85 (5th Cir.2000); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 213, 215, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (excluded alien present at Ellis Island, New York, was treated "as if stopped at the border"); *Kaplan v. Tod*, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925) (excluded alien who had been present in the United States for nine years "was still in theory of law at the boundary line and had gained no foothold in the United States"); *Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir.1987) (recognizing this "entry fiction"). "Aliens subject to deportation generally are granted greater substantive rights than are excludable aliens." *Gisbert*, 988 F.2d at 1440 (citing *Landon*, 459 U.S. at 26–27, 103 S.Ct. 321); *accord Zadvydas*, —— U.S. at ——, 121 S.Ct. at 2500. Hence, in the case at bar, Hernandez, who has been ordered excluded, is treated as if he never entered the United States and, thus, is an excludable, as opposed to a removable, alien. *See Lopez–Vasquez*, 227 F.3d at 485.

Under Fifth Circuit precedent, no time limit exists on the detention of aliens who, like Hernandez, have been denied entry into the United States. *See Gisbert*, 988 F.2d at 1447. In *Gisbert*, a number of excluded Mariel Cubans contested their indefinite detention by the INS while awaiting their repatriation to Cuba. *See id.* at 1439. Following their initial detention, the aliens were released on immigration parole, but that parole was revoked after they were convicted of various violations of state and/or federal law, ranging from petty offenses to felonies. *See id.* at 1440. The aliens filed habeas corpus petitions, contending that their continued detention was unconstitutional, without proper statutory authority, and in violation of international law. *See id.* at 1440–41.

The Fifth Circuit noted that the Supreme Court has "held that detention of aliens pending exclusion does not violate the aliens' constitutional rights." *Id.* at 1441 (citing *Mezei*, 345 U.S. at 215, 73 S.Ct. 625). The court determined that the "continued detention of the petitioners is not punishment and does not constitute a violation of the alien's rights to substantive due process." *Id.* at 1442. Holding that the aliens' procedural due process rights also had not been violated, the court found that the aliens had no constitutional right to parole, that the denial or revocation of parole does not rise to the level of a constitutional infringement, and that the aliens did not contend that the federal regulations "that set forth explicitly the procedure for parole determinations concerning the Mariel Cubans" were not followed. *Id.* at 1443–44.

Regarding the aliens' statutory claims, the court held "that the [Immigration and Nationalization Act] authorizes the Attorney General to continue to detain petitioners, whether or not they have been convicted of aggravated felonies, until the United States is able to deport them." *Id.* at 1447. Under 8 U.S.C. § 1226(e) (1996), applicable to Hernandez because he was placed in exclusion proceedings prior to April 1, 1997, the effective date of the

Illegal Immigration Reform and Immigrant Responsibility Act of 1996:

> (1) Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation and regardless of the rearrest or further confinement in respect of the same offense).
>
> (2) Notwithstanding any other provision of this section, the Attorney General shall not release such felon from custody unless the Attorney General determines that the alien may not be deported because the condition described in section 1253(g) of this title exists.
>
> (3) If the determination described in paragraph (2) has been made, the Attorney General may release such alien only after—
>
> > (A) a procedure for review of each request for relief under this subsection has been established,
> >
> > (B) such procedure includes consideration of the severity of the felony committed by the alien, and
> >
> > (C) the review concludes that the alien will not pose a danger to the safety of other persons or to property.

8 U.S.C. § 1226(e) (1996). Section 1253(g) addresses a situation in which "any country upon request denies or unduly delays acceptance of the return of any alien who is a national, citizen, subject, or resident thereof." The Fifth Circuit, following the lead of the Ninth Circuit, construed the statute as explicitly granting the Attorney General discretion to detain excludable aliens convicted of aggravated felonies. *See Gisbert*, 988 F.2d at 1445–46 (citing *Alvarez–Mendez*, 941 F.2d at 961–62). Specifically, the court found that the statute permits the indefinite detention of Mariel Cubans who have been convicted of aggravated felonies and also concluded that Congress has implicitly authorized the Attorney General to detain indefinitely Mariel Cubans who have been convicted of crimes other than aggravated felonies. *See id.* Finally, the court held that neither public international law nor international human rights law was violated by the aliens' continued detention. *See id.* at 1447–48.

In his response, Hernandez relies on the Ninth Circuit's decision in *Ma v. Reno*, holding that a resident alien, convicted of an aggravated felony and ordered removed to Cambodia, could not be held indefinitely beyond a reasonable time after the expiration of the ninety-day period authorized for removal under 8 U.S.C. § 1231(a) (1994), given the lack of a repatriation agreement between the United States and Cambodia. *See* 208 F.3d 815, 818, 830–31 (9th Cir.2000), *vacated,* —— U.S. ——, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). After granting *certiorari*, the Supreme Court vacated and remanded *Ma* to the Ninth Circuit because "its conclusion may have rested solely upon the 'absence' of an 'extant or pending' repatriation agreement without giving due weight to the likelihood of successful future negotiations." *Zadvydas,* —— U.S. at ——, 121 S.Ct. at 2505. Hernandez, however, has been excluded, not ordered removed. Thus, the *Ma* case is inapposite. Moreover, as the United States points out, the Ninth Circuit in *Barrera–Echavarria v. Rison,* a case involving excludable Mariel Cubans, found that the long-term detention of excludable aliens was supported by statutory authority and did not violate the Constitution. *See* 44 F.3d 1441, 1443, 1446, 1450 (9th Cir.), *cert. denied,* 516 U.S. 976, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995). Indeed, the court in *Ma* expressly distinguished the case before it from that of *Barrera–Echavarria* because the latter concerned ex-

cludable aliens. *See Ma*, 208 F.3d at 823, 824–25. Hence, *Barrera–Echavarria*, rather than *Ma*, is the Ninth Circuit decision germane to the factual scenario presented in the case at bar.

In any event, this court is obligated to follow Fifth Circuit authority, not the case law of the Ninth Circuit. The court is bound by applicable Fifth Circuit precedent in the absence of an intervening United States Supreme Court or *en banc* Fifth Circuit decision to the contrary. *See Randall v. Chevron U.S.A., Inc.*, 13 F.3d 888, 898 n. 5 (5th Cir.), *modified on other grounds*, 22 F.3d 568 (5th Cir.), *cert. denied*, 513 U.S. 994, 115 S.Ct. 498, 130 L.Ed.2d 408 (1994); *Perez v. Brown & Williamson Tobacco Corp.*, 967 F.Supp. 920, 925 (S.D.Tex.1997); *Jett Racing & Sales, Inc. v. Transamerica Commercial Fin. Corp.*, 892 F.Supp. 161, 163 (S.D.Tex. 1995); *Cedillo v. Valcar Enters. & Darling Del. Co.*, 773 F.Supp. 932, 936 (N.D.Tex. 1991); *Peregoy v. Amoco Prod. Co.*, 742 F.Supp. 372, 375 (E.D.Tex.1990), *aff'd*, 929 F.2d 196 (5th Cir.), *cert. denied*, 502 U.S. 864, 112 S.Ct. 188, 116 L.Ed.2d 149 (1991); *see also Coca–Cola Bottling Co. v. Coca–Cola Co.*, 988 F.2d 386, 411 n. 25 (3rd Cir.), *cert. denied*, 510 U.S. 908, 114 S.Ct. 289, 126 L.Ed.2d 239 (1993). In this instance, the Fifth Circuit's opinion in *Gisbert* is the controlling authority.

Recently, the United States Supreme Court vacated and remanded the decision in *Ma* as well as the Fifth Circuit's opinion in *Zadvydas*, another case involving removable, rather than excludable, aliens. *See Zadvydas*, —— U.S. at ——, 121 S.Ct. at 2495; *see also Ma*, 208 F.3d at 824–25; *Zadvydas v. Underdown*, 185 F.3d 279, 297 (5th Cir.1999), *vacated*, —— U.S. ——, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001). The Court expressly stated, "We deal here with aliens who were admitted to the United States but subsequently ordered re-moved. Aliens who have not yet gained initial admission to this country would present a very different question." *Zadvydas*, —— U.S. at ——, 121 S.Ct. at 2495. In *Zadvydas*, the Court construed the post-removal detention statute to contain an implicit "reasonable time" limitation of six months, after which time, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," the government must rebut that showing in order to detain the alien further. *Id.* at 2495, 2505. The Court, however, specifically distinguished the case before it from *Mezei*, stating that although *Mezei* also involved indefinite detention, it differed from the case under consideration in a "critical respect" because the alien in *Mezei* was an excludable alien, treated for constitutional purposes as if he had never entered the United States. *See id.* at 2500 (citing *Mezei*, 345 U.S. at 213, 215, 73 S.Ct. 625).

■ Because the Supreme Court's decision in *Zadvydas* is inapplicable to aliens who are subject to orders of exclusion, it does not alter the effect of *Gisbert*, the governing Fifth Circuit authority on this issue. As the United States District Court for the Northern District of Texas has pointed out, "It is well settled in the ... situation involving excludable aliens awaiting return to their native countries, that such aliens can be detained even if such detention is prolonged because no country is willing to take the alien." *Tung v. Meissner*, 98 F.Supp.2d 779, 784 (N.D.Tex. 2000) (citing *Mezei*, 345 U.S. at 215–16, 73 S.Ct. 625; *Gisbert*, 988 F.2d at 1448). Cuba has not repudiated its November 1987 agreement to accept returning Mariel Cubans. *See Gisbert*, 988 F.2d at 1446 n. 17. Under the circumstances, "[t]he United States cannot be forced to violate its national sovereignty in order to parole these

aliens within its borders merely because Cuba is dragging its feet in repatriating them." *Id.* at 1447 (citing *Lynch,* 810 F.2d at 1373).

 Like the petitioners in *Mezei* and *Gisbert,* Hernandez has been effectively barred from entry into the United States and has been ordered excluded. Although he has been granted probation and parole on a number of occasions, both by the State of Florida and by the INS, he has repeatedly violated the terms of his release through the commission of additional crimes. The record further reflects that, while in INS custody, Hernandez has received annual reviews as contemplated by the regulations established for Mariel Cubans, and, since his latest detention on January 3, 1997, has consistently been denied parole due to his criminal record, his disciplinary problems while in detention, and his lack of credibility before the Cuban Review Panel. Hernandez has adduced no evidence to rebut that presented by the United States. Thus, "[t]he petitioner in this action has been denied parole for facially legitimate reasons in a statutory scheme that permits such decisions. The petitioner may also claim the benefit of annual review of his status pursuant to the Cuban Review Plan. His petition is an unexceptional variation of a now-familiar theme, the points of which have been rejected by the courts again and again. No constitutional guarantee or statutory right has been violated through the petitioner's detention." *Sanchez v. Kindt,* 752 F.Supp. 1419, 1433 (S.D.Ind.1990). As a consequence, Hernandez has made no showing that warrants federal habeas corpus relief.

IV. *Conclusion*

Accordingly, the United States' motion for summary judgment is GRANTED, and Hernandez's Petition for a Writ of Habeas Corpus is DENIED.

Hernandez fails to present a claim that merits relief. Controlling case law imposes no time limit on the length of detention of aliens denied entry into the United States. Moreover, Hernandez's inability to refrain from criminal conduct while released from confinement, as well as his misconduct while in INS custody, justifies his detention. Thus, no material facts remain in dispute, and the United States is entitled to judgment as a matter of law.

IT IS SO ORDERED.